1   Justin G. Reedy

2   7295 Amherst Street

3   Sacramento, CA 95822

4   (916) 428-1510

5   Plaintiff, In Pro Per

**FILED**

APR 0 1 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

6

7

8                UNITED STATES DISTRICT COURT

9                EASTERN DISTRICT OF CALIFORNIA

10

11   Justin G. Reedy,

12           Plaintiff,

13       v.

14   El Dorado County Superior Court,
15   Hon. Lauren C. Bowers, and
     Rebecca Nelson,
16
17           Defendants.

No. 2:24-CV-0649 KJM JDP (PS)

**FIRST AMENDED COMPLAINT –
VIOLATIONS OF CIVIL RIGHTS**

**DEMAND FOR JURY TRIAL**

1. **Violation of Title II Americans with
   Disabilities Act OF 1990 (ADA)**

2. **42 U.S.C. § 1983 Violation of U.S.
   Constitution, Fourteenth Amendment**

3. **Violation of California Constitution –
   Equal Protection and Due Process**

4. **Violation of Cal. Fam. Code § 3049**

18

19

20

21

22                **SUMMARY OF THE CASE**

23       This complaint is filed by Justin G. Reedy against the Superior Court of El Dorado

24   County, Honorable Lauren C. Bowers, and Child Custody Recommending Counselor, Rebecca

25   Nelson. The complaint alleges that the defendants, acting under color of state law, discriminated

26   against the plaintiff on the basis of his disabilities. The plaintiff alleges violations of Title II of

27   the Americans with Disabilities Act of 1990, the fourteenth amendment, the California

28

1    Constitution, California Civil Code §§51(f), 54(c), and 54.1(d), California Family Code §3049,

2    and other federal regulations.  The defendants are accused of failure to provide reasonable

3    accommodations, denial of equal access, lack of effective communication, disparate treatment,

4    failure to consider the plaintiff's individualized needs on a case-by-case basis consistent with

5    facts and objective evidence, and both deliberate indifference and conscious disregard for the

6    rights and safety of the plaintiff, a disabled father.  The complaint seeks injunctive relief,

7    compensatory damages, and any other relief the court deems just and proper.

8    **I.**     **Jurisdiction**

9         A. Plaintiff brings this action pursuant to Title II of the Americans with

10           Disabilities Act of 1990 (ADA) for violations of civil rights; pursuant § 1983

11           deprivation of the protections guaranteed under the Fourteenth Amendment to

12           the United States; and pursuant the California Constitution.

13        B. This court has subject-matter jurisdiction over this matter pursuant to:

14           a.  Plaintiff is now and has been a U.S. citizen and resident of Sacramento

15                County for all the time during which the actions giving rise to this

16                claim accrued.

17           b.  28 U.S.C. §1331 (civil actions arising under the Constitution, laws, or

18                treaties of the United States). This complaint arises out of violation of

19                federal law, including the 14th Amendment Due Process Clause and

20                Equal Protection Clause of the U.S. Constitution, and Americans with

21                Disabilities Act of 1990 and § 504 of Rehabilitation Act of 1973.

22           c.  28 U.S.C §1343(3) (states in relevant part, it's intent: "(3) To redress

23                the deprivation, under color of any State law, statute, ordinance,

24                regulation, custom or usage, of any right, privilege or immunity secured

25                by the Constitution of the United States or by any Act of Congress

26                providing for equal rights of citizens or of all persons within the

27                jurisdiction of the United States; (4) To recover damages or to secure

28

equitable or other relief under any Act of Congress providing for the

protection of civil rights, including the right to vote.

d.  28 U.S.C. §1367(a) (in any civil action of which the district courts have

original jurisdiction, the district courts shall have supplemental

jurisdiction over all other claims that are so related to claims in the

action within such original jurisdiction that they form part of the same

case or controversy...);

e.  28 U.S.C §1391(b) (defendant's unlawful violations under color of

state law of Plaintiff's constitutional rights giving rise to the claims

herein accrued within this district and division);

f.  These constitutional law violations are "capable of repetition, yet

evading review." *Roe v. Wade*, 410 U.S. 113, 125 (1973) (citing

*Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911),

*Moore v. Ogilvie*, 394 U.S. 814, 816 (1969), *Carroll v. Princess Anne*,

393 U.S. 175, 178-179 (1968), *United States v. W.T. Grant Co.*, 345

U.S. 629, 632-633 (1953));

## II.    Parties

A.  Plaintiff, Justin G. Reedy.

B.  Superior Court of California, County of El Dorado

C.  Honorable Lauren C. Bowers

D.  Child Custody Recommending Counselor, Rebecca Nelson

## III.    Introduction

1.    Plaintiff, Justin G. Reedy, is a natural person.  He is not now, nor has he ever been

married.

JURISDICTION

2.    Both an ADA and a 42 U.S.C. § 1983 suit may be permissible if there are alleged

1  violations under each.  See *Baum-gardner v. County of Cook*,[1] (N.D. Ill. 2000).  Plaintiff alleges

2  concrete and particularized violations of Title II of the ADA and 14th Amendment of the U.S.

3  Constitution, the California Constitution, and other state laws.  Therefore, the court should not

4  dismiss on the pleadings pursuant *Credle-Brown v. Connecticut*,[2] (D. Conn. 2007).

5  3.    Plaintiff alleges that he has suffered an injury in fact and that there is a causal connection

6  between his injury and the Defendants' collective and individual conduct, and that his injury is

7  likely redressable by a favorable decision. *Lujan v. Defs. of Wildlife*[3] (1992).  Plaintiff alleges that

8  his injury is "concrete and particularized," and "actual or imminent, not conjectural or

9  hypothetical." *Id. at 560* (internal quotation marks omitted).

10                      **IV.    Factual Background**

11  4.    Plaintiff is the Petitioner in a family law proceeding in the Superior Court of California,

12  County of El Dorado, Case Number PFL20180289.  The parties in the family law case have one

13  child, DOB: 6/19/2018.  Plaintiff filed a Petition to Establish Paternity and a Parental

14  Relationship on 4/16/2018.  The parties share joint, equal custody of the child since 5/22/2019.

15  5.    The plaintiff is a "qualified" individual under the Americans with Disabilities Act (ADA)

16  42 U.S.C.A. §12131(2): He "meets the essential eligibility requirements for receipt of services or

17  participation in the programs...provided by the [court] with or without reasonable modifications

18  to rules, policies, or practices, removal of ...communication...barriers, or the provision of

19  auxiliary aids and services."

20  6.    The plaintiff has provided documentation of his disabilities including a letter from an

21  educational institution where he was tested as an adult (recent) which states that people with

22  learning disabilities *by definition*[4] have average to above-average intelligence.  He provided a

23  second letter from a behavioral health specialist[5] that states that he has a neuroperceptual

24  condition recognized under the ADA and that due to this condition, he needs the special

25  accommodation of a *support advocate* in court settings.

26  ─────────────
   [1] 108 F. Supp. 2d 1041.

27  [2] 504 F. Supp. 2d 292, 299.
   [3] 504 U.S. 555, 560-61.

28  [4] Emphasis is added throughout the text.
   [5] Behavioral specialist qualifications outlined on page 12 lines 14-16.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    The plaintiff's impairment affects the *speed* at which he is able to *process* both verbal and

2    written *communication*, impacting his cognitive functions, concentration, and ability to

3    effectively communicate, all of which are acknowledged as essential life activities under the

4    ADA. This type of disability is exacerbated in adverse and stressful conditions. Despite this

5    impairment, the plaintiff is legally obligated to engage in court proceedings, irrespective of legal

6    representation, or he risks forfeiting his fundamental right to maintain a parental relationship with

7    his child. The plaintiff underscores that the weakening and/or termination of *paternal* bonds is not

8    only a common and unjust outcome in many custody proceedings, but that loss of custody

9    disproportionately affects disabled parents.[6] The ADA is designed to "provide a clear and

10   comprehensive national mandate for the elimination of discrimination against individuals with

11   disabilities." [§§12101(b)(1), (b)(4).

12   The plaintiff has a long-term, degenerative orthopedic disability for which he was

13   removed from work in 2019, placed on State Disability, and referred to the Department of

14   Rehabilitation to seek retraining on light duty. He requires frequent treatment for pain and

15   immobility. This disability is gravely exacerbated by excessive driving.

16   7.    The plaintiff has provided copies of relevant documentation to the Court; he filed a copy

17   of his GPA on January 19, 2022, which was negligibly lower than the mother's GPA.

18   8.    The plaintiff filed an MC-410 Request for Disability Accommodations with the Court on

19   June 7, 2018 asking for ongoing accommodations specifically stating, "[he] may have difficulty

20   understanding implications of decisions and require additional explanation." The request was

21   denied citing that the accommodation "fundamentally alters the nature of the service, program, or

22   activity." The Court offered that he could "ask for clarification of rulings during the

23   proceedings."

---

[6] Several studies and reports have highlighted disparities faced by disabled parents in custody proceedings. For instance, a study conducted by Robyn Powell and published in the Berkeley Journal of Gender, Law & Justice found that parents with disabilities experience significant discrimination in child welfare and family law proceedings, leading to a higher likelihood of losing custody compared to parents without disabilities. Another report by the National Council on Disability titled "Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children" also documented numerous instances of discrimination against disabled parents in custody cases.

While exact percentages may not be readily available, these studies and reports emphasize the importance of addressing systemic barriers and biases that contribute to the disproportionate loss of custody by disabled parents.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    Plaintiff did not have the letter from the behavioral specialist at the time, but without a

2    support advocate or an attorney, the proceedings advance too quickly for the plaintiff to process

3    questions or to anticipate legal implications in the moment. Therefore, the proposed

4    accommodation was not effective for Plaintiff and did not meet the requirements of the ADA.

5    9.    Plaintiff appeared in pro se on August 1, 2018 prepared with photos of his home and a

6    written statement for the Court which he was not permitted to read. The mother was represented.

7    The Court would not grant interim orders. Plaintiff didn't know what this meant. The Court

8    referred the parties to Child Connect. Plaintiff didn't know what that was. Due to his processing

9    deficit, he felt rushed and was unclear what he was signing. The bailiff said, "Don't worry,

10    everyone signs it." The form was a referral to supervised visitation. Because the mother retained

11    sole custody by default, she imposed this on the plaintiff and the COURT granted the referral

12    effectively enforcing formal supervised visitation without the necessary findings of harm that are

13    required to impose such restrictions. Plaintiff was told that this would not have happened had he

14    been represented.

15    The parties were ordered to attend Child Custody Recommending Counseling (CCRC)

16    and a follow up hearing was scheduled for October 10, 2018.

17    10.    As the petitioner in the family law case, the plaintiff is mandated to participate in CCRC,

18    which is part of Family Court Services, typically called "mediation."

19    CCRC is initiated when a party files a motion to establish or change custody/visitation.

20    The court sets an appointment for an interview and calendars a follow up hearing. The California

21    Rules of Court, Rule 5.210 puts forth the "standards of practice and administration for court-

22    connected child custody mediation services." The Counselor must meet with the parties in a face-

23    to-face interview to identify agreements/issues. The Counselor furnishes the Court and the

24    parties with a confidential report, including their recommendations to the Court, at least 10 days

25    prior to the hearing. Reply declarations can be filed up to five days prior to the hearing.

26    11.    Due to the high conflict of this case, the parties have always met separately. There have

27    been six CCRC interviews between 2018 and 2024.

28    12.    The plaintiff did not request accommodations for the first four interviews.

6

13.     The Court assigned Connie Jo Neustadter, an experienced Licensed Clinical Social Worker, whose associate licensure began in 1990. She conducted the first two interviews with the parties.[7] She was informed of Plaintiff's learning disabilities by collateral contact with paternal grandmother; she noted this in her *first report*. At no time did Ms. Neustadter indicate any concerns that Plaintiff was unable to participate equally as a parent and make sound decisions for the child. In contrast, she expressed concerns about *the mother's unwillingness to coparent*.

14.     The parties went to trial on May 22, 2019. They appeared before Honorable Daniel B. Proud shortly before his retirement from the bench. Plaintiff testified. Judge Proud made no observations of adverse behaviors during Plaintiff's half-day appearance in the courtroom. Judge Proud informed the parties' attorneys that he was granting joint equal custody and instructed them to work out the details.

15.     The mother negotiated a stipulation for another CCRC interview with a new counselor. Plaintiff reluctantly agreed anticipating no changes in custody since it was granted at trial.

16.     The Court assigned Ady Langer, another experienced Licensed Clinical Social Worker whose associate licensure also began in 1990. Ms. Langer also conducted two interviews with the parties.[8] Ms. Langer did not recommend any changes to joint equal custody.

17.     Mother raised the issue of Plaintiff's learning disabilities at least three times between 2018 and 2021.[9] During this time, Judge Proud retired and Judge Jaime Pesce replaced him. Neither of them gave any weight to the mother's unfounded complaints.

18.     On December 21, 2021, the mother filed a request for a change in custody/visitation and for the child to attend school in her neighborhood. Ms. Langer met with the parties on January 4, 2022; her report of February 3, 2022 recommended no changes and for the parties to search for a midway school between their homes. Ms. Langer retired in June 2022.

19.     The mother filed a new request seeking sole custody on August 16, 2022 triggering another CCRC interview on September 9, 2022 with a new CCRC counselor.

---

[7] CJ Neustadter wrote the first two CCRC reports dated 10/1/2018 and 4/30/2019.
[8] A. Langer: CCRC reports dated 8/30/2019 and 2/3/2022.
[9] Mother raised the issue of learning disabilities on 10/9/2018, 11/28/2018, and 12/21/2021. (See Plaintiff's Responsive Declaration Re: Vexatious Litigation filed June 20, 2023; Judge Bowers ignored mother's repeated attempts to gain full custody but admonished Plaintiff as a vexatious litigant on several occasions.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    •    REBECCA NELSON

2    20.    The Court assigned Rebecca Nelson.  She had an Associate License in Social Work from

3    2013 to 2014 but never became fully licensed by the Board of Behavioral Sciences.  It was

4    unclear what her qualifications were; She was "exempt" from licensure.

5    21.    The Court's Register of Actions at the time the interview was scheduled indicated that

6    paternal grandmother was a joined party.  Plaintiff emailed the family law facilitator asking if she

7    could "accompany [him] to mediation on 9/9/2022 as a support person due to [his] learning

8    disabilities."  He stated, "[she] was also joined to the case."

9        Believing that paternal grandmother would have an interest as a party to any changes to

10   custody, the facilitator affirmed.  Paternal grandmother informed Plaintiff the day before the

11   interview that she could not find the motion for joinder but thought it was vacated and couldn't,

12   in good faith, attend the interview.

13       The plaintiff was anxious due to not having any accommodations.  His concern was that

14   the new Counselor would not read the extensive file, and this put enormous pressure on him to

15   have to *communicate the history of the case*" from memory.

16       The Court's misinformation initiated the plaintiff's email to the family law facilitator.

17   The plaintiff alleges that this left no time to file an MC-410 Request for Disability

18   Accommodations form.  The plaintiff alleges that when he raised the issue of disability

19   accommodation with the facilitator's office, he should have been immediately been directed to

20   the ADA Coordinator regardless of whether another party was joined to the case pursuant

21   California Rules of Court, Rule 1.100(b), (c)(1) which states that "Requests must be forwarded to

22   the ADA coordinator, also known as the access coordinator, or designee, within the time frame

23   provided in (c)(3)."

24       •    THE FIRST CCRC INTERVIEW WITH REBECCA NELSON

25   22.    On September 9, 2022, Plaintiff was in the hallway when REBECCA NELSON opened

26   the door and asked both parties to come in.  Plaintiff had indicated the parties attend separately on

27   the mediation questionnaire.  He refused a joint meeting explaining, "she talks circles around

28   [him]." Rebecca Nelson's demeanor immediately changed.  She instructed him harshly to return

1  in 40 minutes. When he returned, he saw the mother leaving, smiling. Rebecca Nelson's
2  demeanor toward her was friendly.

3  23.    Rebecca Nelson's demeanor toward the plaintiff was hostile; Her tone of voice was
4  demeaning. The plaintiff experienced emotional distress, anxiety, and agitation further
5  debilitating him in the interview. As a result, he could not answer Rebecca Nelson's questions on
6  equal footing with other parties generally, nor on equal footing with the mother.

7     Rebecca Nelson began the interview stating, "the Court was sick of both of [both of them] and
8  that she was "going to choose one parent." She effectively threatened Plaintiff with the loss of
9  custody as he entered the room. She bullied the plaintiff by persistently asking if he was getting
10  therapy and if he was on any medications. At one point, he asked her if she had asked the mother
11  the same question, pointing out that she had singled him out for this line of questioning.

12  24.    Rebecca Nelson grilled the plaintiff on details he couldn't remember. He wasn't able to
13  recall why he was late to a play therapy appointment (it was due to three traffic accidents
14  documented on Apple Maps); he couldn't recall why he missed one play therapy appointment
15  (the day his grandfather died). Given appropriate accommodations and the opportunity to review
16  notes or records, he could have given appropriate answers to these questions.

17  25.    Rebecca Nelson asked why the child was dismissed from Brookfield School, a private
18  preschool/daycare he had enrolled the child in on *his parenting time*. He replied he didn't know.
19  He wasn't given a valid reason or consistent answer by the preschool director, Tanisha Day, to be
20  able to answer the question. Plaintiff stated the problems arose after Ms. Day and the mother
21  became friendly.

22  26.    Paternal grandmother wrote a Yelp review warning of the problems at Brookfield School.
23  The mother brought this up to Rebecca Nelson in her interview; She could only have been alerted
24  to the Yelp review if someone from the school had contacted her about it.

25     Rebecca Nelson repeatedly badgered the plaintiff with the mother's accusations. She
26  didn't allow him to express his own concerns. Because of the high conflict in this interview, he
27  was having trouble expressing himself clearly. When confronted with accusations about the Yelp
28  review, he asked Rebecca Nelson to speak with paternal grandmother who wrote it.

27. Despite his difficulty concentrating and communicating under such extreme duress, Rebecca Nelson reported him specifically stating that she "was not being objective."

28. Rebecca Nelson told Plaintiff that she wanted to speak with his therapist. He gave her his name and explained that he was not currently employed at the medical center where the plaintiff is a client. Rebecca Nelson looked up his therapist online and shoved a HIPAA form toward him. The plaintiff feared that if he didn't sign it, he would appear to be uncooperative. He signed it under duress. Rebecca Nelson did not inform him that she would obtain his medical records. She did not explain his rights under HIPAA nor offer for him to take the form to an attorney for review and return it. She subsequently disseminated his private medical information in the confidential report she provided to the mother and the Court.

29. Rebecca Nelson discriminated against the plaintiff when she failed to perform a balanced inquiry. She contacted Ms. Day as a collateral contact and documented her out-of-court prejudicial statements. She noted that Ms. Day made a comment that the plaintiff has a processing disorder in the report. She did not contact paternal grandmother to ask about the conflict with the preschool or the reason for the Yelp review.

She did not seek the plaintiff's therapist's current phone number or address through the State Licensing Board – the Board of Behavioral Sciences - where he is mandated to update this information. Had she done so, she could have spoken with him directly instead of obtaining the plaintiff's medical records.

30. The plaintiff alleges that Rebecca Nelson intentionally discriminated against him and that her actions were committed with deliberate animus and conscious disregard for his rights based on his disabilities.

31. Rebecca Nelson's report dated September 27, 2022 recommended the plaintiff lose legal custody and have supervised visits four hours per week. Rebecca Nelson concluded that because of the Yelp review, paternal grandmother was not an appropriate person to supervise the plaintiff during visits with the child. This would mean that the child's relationship with her father, her grandparents, and her friends would be abruptly severed based on layered hearsay instigated by the mother and obtained by deliberate animus of the Court against the plaintiff.

10

32.     Rebecca Nelson's discrimination led to a three-day trial where Plaintiff had to "prove" to the court that he was a fit parent after nearly four years of joint equal custody without incident.

33.     On October 6, 2022, Plaintiff filed a formal complaint with the Court citing coercion, violations of HIPAA confidentiality, and unethical, disparaging and harassing treatment on the basis of his disabilities. The Court Administration responded by letter stating Rebecca Nelson denied any wrongdoing and that the complaint was "not a matter that Court Administration can address, but is a matter that the Court, through its decision on the underlying Custody/Visitation action, will address at the pending hearing."

34.     The plaintiff alleges that the Court's inaction in addressing the situation appropriately resulted in ongoing discrimination. The plaintiff alleges that the staff acted with deliberate indifference to his complaint and that they lacked appropriate sensitivity training.

35.     On October 10, 2022, the plaintiff filed a Reply Declaration to the CCRC report and attached as an addendum the Department of Justice technical assistance publication "Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act."[10] In doing so, he informed JUDGE BOWERS of the discrimination.

- DENIAL OF REASONABLE ACCOMMODATIONS FOR TRIAL

36.     The plaintiff filed an MC-410 Request for Accommodation on March 6, 2023, weeks prior to trial, asking for extra time to process questions, responses, and written materials; help with organizing papers; and permission to use Live Scribe Echo pen for notetaking. His request was denied in whole stating it does not meet the requirements of Cal. Rules of Court, rule 1.100 and that it changes the basic nature of the court's service, program, or activity.

The plaintiff was not aware at the time that the California Rules of Court, Rule 1.150 (d), provides, "The judge may permit inconspicuous personal recording devices to be used by persons in a courtroom to make sound recordings as personal notes of the proceedings. A person

---

[10] https://www.ada.gov/resources/protecting-parent-rights/.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1  proposing to use a recording device must obtain advance permission from the judge. The
2  recordings must not be used for any purpose other than as personal notes."

3  The Court failed to engage in an interactive process by offering any alternative. The ADA
4  Coordinator did not inform him that he could contact the family law facilitator to seek help with a
5  request from the judge for a personal recording device. Alternatively, the ADA Coordinator has
6  the authority to send the request to the judge. Not being aware of the rules of court pertaining to
7  personal recording devices, the plaintiff didn't file an appeal on the matter or make a request to
8  the judge himself because he wasn't aware of the options.

9  The plaintiff was denied reasonable accommodations for a three day trial where he could
10  lose custody. He needed these accommodations to effectively communicate with the COURT
11  and with his attorney. He was denied the opportunity to review each witnesses testimony to
12  effectively prepare rebuttal arguments and cross-examination questions with his counsel, and
13  therefore, he was denied due process of law.

14  37.  The plaintiff contacted Disability Rights California to locate a support advocate. He could
15  not find any program for disabled persons that would assist in any family law related matters.
16  The plaintiff's family were excluded from the hearings as witnesses and could not help with
17  notetaking or organizing papers. The plaintiff did not make a subsequent request for
18  accommodations for the trial because he had no alternatives.

19  • THE MAY 2023 TRIAL

20  38.  Rebecca Nelson testified that she had been working as a "Recommending Custody
21  Mediator in El Dorado County" for three years, and she has *never been* a Licensed Clinical Social
22  Worker. She has a master's degree in Social Work but has no professional licensure; her
23  experience prior was working for Child Protective Services for about 23 years.[11]

24  39.  Rebecca Nelson stated that she has testified "a lot" in court and that she has been
25  "qualified as an expert in child-abuse cases, in family law cases, and child development."[12] The
26  Court found that REBECCA NELSON is an expert in parenting plans and that she is *not an*

27

28  [11] Cert. Trans. 5/23/2023 pg. 137 lines 8-24.
    [12] Id. pg. 138 lines 4-11.

1   *expert in child development.*[13]

2   40.      Rebecca Nelson testified that her basis for sole legal custody to the mother was that "when

3   she was talking with [Plaintiff] in the office, she questioned his behavior…[the paternal

4   grandmother wrote a Yelp review] and then [she] read the Yelp review and [she] had spoken to

5   the teacher, who was telling [her] that [plaintiff] was not - -"

6         The plaintiff's attorney objected to hearsay. The objection was sustained.[14]

7   41.      Rebecca Nelson testified that "Documents that she read regarding [Plaintiff's] mental

8   health were unclear to [her] and [she] really wanted just to have a professional provide an

9   assessment for the court so [they] could determine what a better parenting plan might be for the

10  child."[15]

11        Rebecca Nelson testified that she "Googled Plaintiff's therapist" but "did not look for his

12  phone number or address under his licensure with the State."[16]   She agreed under oath that "[h]is

13  opinion in this case could have helped better inform [her] recommendations."[17]

14        The plaintiff alleges that she coerced his consent on the HIPAA form to obtain his medical

15  records for a fishing expedition to see if she could justify taking his custody.

16  42.      Rebecca Nelson affirmed in her testimony that "[she] discussed with [Plaintiff] the

17  *appointments* that resulted in the *belief the child had been abused.*"

18        The plaintiff didn't discern Rebecca Nelson's distortion of the facts without a Live Scribe

19  pen to help him take notes so he could review the testimony of witnesses with his attorney for

20  rebuttal and cross-examination. Fortunately, his attorney asked him questions on the stand that

21  countered her allegations. Her testimony could have resulted in the plaintiff's loss of custody

22  because it *constitutes an allegation of abuse.* She is the Court's expert witness. The plaintiff

23  alleges that her false testimony was intended to justify her recommendations of sole custody to

24

---

25  [13] Id. pg. 144 lines 1-3.
    [14] RN used these same hearsay statements in her second CCRC report dated 2/13/2024 to support the same
26  arguments. She didn't contact Blue Oaks Elementary School where the child is currently attending to enquire about
    Plaintiff's engagement with the school officials and teachers or his volunteer participation in the Watch D.O.G.S.
27  program (Dads of Great Students).
    [15] *Id.* at 11; 5/23/23 pg. 145 lines 22-28; pg. 146 lines 1-27.
    [16] *Id.* at 11; 5/23/23 pg.161 lines 13-28.
28  [17] *Id.* at 11; 5/23/23 pg. 162 lines 1-4.

mother and supervised visitation for him and that her actions were committed with deliberate animus and conscious disregard for his rights based on his disabilities, and this includes his fundamental right to the care, custody, and control of his child.

There were several calls to CPS from mandated reporters that resulted from the plaintiff's phone contact with play therapists to find a suitable provider when his request for play therapy was granted. CPS responded to the calls by coming to the plaintiff's home where the child was interviewed by an Associate Licensed Clinical Social Worker who closed the case when the plaintiff explained that the issue was already before the Court.

43.    Rebecca Nelson testified that "she was concerned…because every time a child is taken to a doctor or ***interviewed by a social worker or anyone else***, it's ***traumatizing to the child*** when there's been no evidence of abuse."[18]

44.    Rebecca Nelson was asked whether she knew if Plaintiff's disabilities could affect his behaviors. She testified that "[she] has quite a bit of experience with individuals with learning disabilities, and his behaviors in [her] office were different from those of [her] experience with learning disabilities." She was asked if she would rely more on a clinical psychologist to evaluate and describe what behaviors would be normal. She replied that "[she didn't] like the word normal because we're all very different." "But to help determine what is the learning disability versus mental health…[she] had this other component that [she] wasn't sure about…"

The plaintiff's attorney said, "We'd rely on the psychologist to weigh in on that…" She responded, "[She relies] on the experts."[19]

The plaintiff was compelled to subpoena his therapist to court. His therapist had to give up a day with clients to rebut Rebecca Nelson's conclusions about the medical records she obtained. The therapist saw the plaintiff over the course of about 3.5 years since the onset of the legal proceedings. The therapist has 33 years of experience as a Licensed Clinical Social Worker and is Double Board Certified by the American Board of Clinical Social Work in Clinical Practice

---

[18] *Id.* at 11; 5/23/23 pg. 149 lines 2-13.
[19] *Id.* at 11; 5/23/23 pg. 170 lines 9-28 – pg. 171 lines 1-8.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    and in Supervisory Clinical Practice.[20]

2         The plaintiff's therapist testified that "[he] does not believe there are any mental health

3    issues with father that would prevent him from parenting a young child" and that "[he] believes

4    [plaintiff] is of sufficient intellectual capacity to care for a young child" and he touted the family

5    for their *appropriate support of him in this role and their supportive network for the child*.[21]

6    45.    The plaintiff had also seen a Board Certified Adult Psychiatrist on two occasions for a

7    self-referred evaluation to rebut Rebecca Nelson's testimony. She was unable to appear as a

8    witness due to her schedule. The Court determined her testimony would be relevant but also

9    found it would be cumulative and an offer of proof was made relating to a letter the doctor

10    prepared for the plaintiff regarding her assessment.[22]

11    46.    Tanisha Day of Brookfield School was never called as a witness to allow for cross-

12    examination; her out-of-court statements were objected to in a motion in limine on the basis of

13    prejudicial hearsay, but Judge Bowers allowed Rebecca Nelson to form her opinion based on her

14    conversation. The plaintiff alleges that this is a violation of due process because his attorney had

15    no opportunity to cross-examine Tanisha Day under oath.

16         •   EVIDENCE OF CONSCIOUS DISREGARD FOR PLAINTIFF'S RIGHTS

17    47.    Plaintiff had been observed by his Double Board Certified Licensed therapist, a Board

18    Certified Adult Psychiatrist, two experienced CCRC counselors who were both Licensed Clinical

19    Social Workers, two prior judges, including a one-day trial before Judge Proud, a Licensed

20    Marriage and Family Therapist who interviewed the parents at play therapy, an Associate

21    Licensed Marriage and Family Therapist who provided the child's play therapy, a Psy.D. Child

22    and Adolescent Psychiatrist who evaluated the child with her parents individually, and a CPS

23    worker who came to his home. None of these professionals raised any concerns about Plaintiff's

24    ability to parent.

25    48.    A significant portion of the trial was dedicated to assessing Plaintiff's disabilities and how

26

27      [20] Cert. Trans. 5/31/2023 pg. 26 lines 3-18.
  [21] *Id.* 5/31/23 pg. 36 lines 20-28, pg. 37 lines 1-13.

28      [22] *Id.* 5/31/23 pg. 55 lines 1-8, pg. 57 lines 27-28, pg. 58 line 1.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1  they affect his parenting all resulting from Rebecca Nelson's discriminatory recommendations

2  based on prejudicial hearsay in an attempt to divest him and his child of the paternal relationship.

3  • NO RECOURSE OR REMEDY

4  49.    On August 10, 2023, the Court sent a response to a letter the plaintiff submitted with his

5  concerns.  The Court instructed the plaintiff to review the Local Rules pertaining to challenges to

6  CCRC counselors or evaluators regarding mediator reassignment.  A request to remove Rebecca

7  Nelson from his case would require more litigation, incite more conflict with the mother, and

8  would likely fail since the Administration had already issued a decision on the complaint and the

9  matter was closed.

10  50.    Plaintiff filed a motion for reconsideration that was heard on August 24, 2023.  He

11  subsequently requested a new trial.  Both were denied.  He has since filed a Notice of Appeal.

12  51.    On November 30, 2023, the mother filed a request to change the visitation schedule.  The

13  parties were referred to mandatory Child Custody Recommending Counseling for the sixth time.

14  • THE SECOND CCRC INTERVIEW WITH REBECCA NELSON

15  52.    The plaintiff requested and was granted a support advocate for the interview.  Paternal

16  grandmother was permitted to help him organize his papers and be present for emotional support.

17  53.    The plaintiff alleges that as the interview began on January 11, 2024, Rebecca Nelson

18  stated that "[She] sometimes gets it wrong, like she did with the hearsay, but she doesn't have to

19  get it right because it's the judge's responsibility to get it right."  She also said, "[She] wouldn't

20  make the same mistake again."

21  54.    She thanked Plaintiff for providing the mediation questionnaire.  She then insulted him

22  with a snide comment, stating, "If *you* even wrote it."  She grilled him on the questions to see if

23  he knew the answers on the form.

24  Plaintiff brought his responsive declaration and other documents to refer to and an outline he

25  created freeform by connecting central ideas with the details by drawing lines.  Paternal

26  grandmother testified at the May 2023 trial that this was a typical approach the plaintiff uses to

27

28

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1  identify and work through issues.[23]  Rebecca Nelson barred his approved accommodation by

2  refusing to allow paternal grandmother to help him organize his papers.

3  55.     Rebecca Nelson informed Plaintiff that she would be interviewing their five-year-old

4  daughter.  This caught him by complete surprise.  He was concerned that the mother would be

5  bringing her on her parenting time and would coach the child on what to say.

6         She asked if he wanted the interview on his parenting time, and he said he wasn't sure if it

7  was better that her mother brought her.  He figured this would prove that she's coaching her, but

8  he didn't process that it would be *harmful to the child* until later.

9  56.     Plaintiff had become agitated and anxious in the interview, and paternal grandmother

10  patted him on the shoulder to remind him to keep calm and she reached over and put her hand on

11  his outline to remind him to focus on his issues.

12  57.     Rebecca Nelson snapped at her, stating, "He's doing fine," indicating that paternal

13  grandmother was not to reach out or touch him.  Paternal grandmother raised the issue that she

14  could see he was feeling overwhelmed.  Rebecca Nelson didn't ask how he was feeling; she

15  continued to question him on issues that were not presently before the court that would not be on

16  his outline because they weren't in response to the mother's motion.

17  58.     Paternal grandmother again reached over to refocus the plaintiff to the outline so that he

18  wouldn't lose concentration on the issues he brought to discuss.  Paternal grandmother did not

19  provide any statements during the interview, but there was a discussion of her role in helping

20  write declarations and researching facts for the declarations when the interview was near an end.

21  59.     Rebecca Nelson told him at the end of the meeting that she would have time to review his

22  responsive declaration and anything he filed if he did it soon.  He filed them the same day and

23  wrote two more declarations to address the new issues she brought up in the interview.

24  60.     Rebecca Nelson tried to intimidate paternal grandmother to prevent active

25  accommodations.  She was not present in the interview exclusively as an emotional support person

26  under Local Rule 8.14.01, but also as an accommodation under the California Rules of Court,

27

28  [23] Cert. Trans. 5/24/2023 pg. 93 lines 18-25.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    Rule 1.100(a)(3) pursuant the ADA which requires that the accommodation be reasonable and

2    *effective*.  Rebecca Nelson refused to allow her to organize his papers in the interview in a way

3    that would help him locate relevant information and discouraged interaction that would help him

4    focus on the issues he brought to discuss.  The mother already had her interview and raised her

5    concerns, and he had one hour to provide his own input and needed to be focused on that.

6    61.    Plaintiff filed a formal CCRC complaint on January 16, 2024 citing violations of his civil

7    rights.  He then contacted the Court Administration to ensure they were aware of his opposition to

8    Rebecca Nelson's interview with his five-year-old daughter over the *schedule*.

9    62.    On January 25, 2024, Rebecca Nelson bullied, insulted, and minimized Plaintiff as a

10   parent.  She was demeaning to him in front of his child and his family.  Plaintiff arrived early

11   with his parents and waited downstairs to see his daughter before the interview.  When Rebecca

12   Nelson opened the door, she looked right at him as said, disdainfully, "What are *YOU* doing

13   here?"  His parents were shocked but remained quiet.  When he asked if he could spend ten

14   minutes with his daughter, she said, "Absolutely not." Despite having testified that any interview

15   is traumatic for a child, she denied him the opportunity to give his daughter emotional support.

16   The plaintiff stated for the record that he didn't consent to the interview and then cited that the

17   American Academy of Pediatrics recommends a support person attend the interview with a young

18   child.  Rebecca Nelson disregarded his objections and rejected his alternative proposal.  She

19   wouldn't allow paternal grandfather to attend the interview.

20       When the mother arrived, Rebecca Nelson smiled at her and welcomed her as she came

21   down the stairs.  Rebecca Nelson's differential treatment demonstrated openly that she viewed the

22   mother as the appropriate parent to be present and Plaintiff as an unwelcome intruder.  The child

23   had to be instructed to see her dad by the mother before she would go to him.  The plaintiff

24   alleges that Rebecca Nelson's differential treatment was committed with conscious disregard to

25   his rights as a disabled person.

26   63.    On January 25, 2024, Plaintiff sent an email Shelby Wineinger, CEO of the Court

27   regarding the disrespectful treatment he'd received from Rebecca Nelson.  The Court responded

28   stating it would address the issues but didn't say how the matter would be resolved.  The plaintiff

1   alleges deliberate indifference to his rights as a disabled person.

2   64.     The CCRC report dated February 13, 2024 was another affront to the plaintiff's rights.

3   The plaintiff alleges that in the report, Rebecca Nelson blatantly lied about paternal

4   grandmother's behavior in the interview, stating it was disruptive.  He further asserts that if

5   paternal grandmother was not permitted to continue to be involved as a support advocate, he

6   would be prevented from future accommodations due to the paucity of available disability

7   advocacy groups and their unwillingness to help in any manner involving family law matters.

8   The plaintiff alleges her intention is to isolate him from an *appropriate support network* and

9   cause him to have *no future accommodations* so as to gravely disadvantage him and deny him

10  equal access to Court programs and services.

11  65.     The plaintiff was informed by his attorney that there is a hearsay exception for CCRC

12  interviews with children.  This exception extends to minor's counsel.  Rebecca Nelson demanded

13  to interview the child and then recommended minor's counsel be appointed.  Plaintiff alleges that

14  when Rebecca Nelson told him "she wouldn't make the same mistake again" regarding hearsay,

15  she was planning on using the child's statements to intimidate him.  He alleges she used the

16  child's unverified, unreliable, and demonstrably coached statements to grant more time with the

17  mother and that appointment of minor's counsel may also pose a new risk to the plaintiff by

18  increasing litigation and litigation costs.

19  66.     The plaintiff alleges that Rebecca Nelson's intimidation of him extends to requiring their

20  *five-year-old* be interviewed on a ***change in the schedule*** and he further alleges that this was in

21  retaliation for her loss in court when her report was not adopted and in retaliation for plaintiff

22  complaining about her previous ADA violations.[24]

23  67.     The plaintiff alleges that Rebecca Nelson's actions were committed with deliberate

24  animus and conscious disregard for his rights based on his disabilities.

25  68.     The plaintiff alleges Rebecca Nelson used the interview with the child *to perpetrate harm*

26  *to him regardless of the harm to the child* and that she deliberately compelled the interview

27

28  [24] See October 6, 2022 CCRC complaint.

against Plaintiff's objection, and that Rebecca Nelson continued to discriminate against him on the basis of his disabilities through the mechanism of alleged statements the child made in her office.

69.     The plaintiff's objections contained in his Memorandum of Points and Authorities and his Reply Declaration to CCRC report dated February 13, 2024 are incorporated herein by reference and form a part of this Amended Complaint as if set forth herein in their entirety. (Exhibit A).

70.     Plaintiff alleges that Rebecca Nelson lied about statements she claimed paternal grandmother made in her office in direct conflict with prior statements made in court.  She reported that paternal grandmother stated that she writes the Talking Parents messages and also stated that she made the interview outline.  Paternal grandmother testified on May 23, 2023 regarding both issues testifying under oath that Plaintiff will often use a "diagram with a central issue and free association" and that "she doesn't respond to inquiries on Talking Parents."[25]

71.     Rebecca Nelson's lies imply that Plaintiff *couldn't create the outline himself* and that his disabilities make him *less intelligent and less capable than the mother* without any justification for such a wildly discriminatory falsehood.[26,27]

72.     All of these incidents raised the stress level for Plaintiff causing him grave emotional distress and frustration and have culminated in physical symptoms of peptic ulcer.

Rebecca Nelson instigated litigation and caused him more conflict with the Court and with the mother by empowering her through her differential treatment to believe she is the superior parent.

73.     On February 26, 2024, the plaintiff contacted the family law facilitator's office to enquire how to make a formal complaint to the Committee on the Elimination of Bias.  He received no response.  The plaintiff alleges the Superior Court staff lack the appropriate sensitivity training to communicate with him and that their actions are committed with deliberate indifference to his disability rights.

---

[25] *Id.* at 23; 5/24/23 pg. 93 lines 22-25 and pg. 95 lines 24-26.
[26] Charles Darwin, Agatha Christie, Albert Einstein, George Washington, and Leonardo da Vinci all were affected with learning disabilities. https://www.masters-in-special-education.com/lists/5-historical-figures-who-overcame-learning-disorders/.
[27] Paternal grandmother testified at trial that this was a typical approach Plaintiff uses to identify and work through issues.  See f.n. 11.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1       HONORABLE LAUREN C. BOWERS

2       74.     Judge Bowers has been assigned to Family Law, Department 5 of the Superior Court of

3       California, County of El Dorado since January 21, 2022.

4       75.     On May 23, 2023, during the trial, JUDGE BOWERS allowed Plaintiff "some leeway" to

5       answer a question when he explained that he was having trouble answering due to his disability.[28]

6       He stated to the opposing counsel, "I need a moment.  Please don't rush me.  This is part of my

7       ADA.  I'm doing the best I can..." (Id. pg. 55 lines 8-10).  He repeated, "[He doesn't]

8       recall...[He] can't remember."  (lines 21-22).

9              Plaintiff alleges that he was struggling to answer questions on the stand and that he needed

10      to refer back to materials in the record but didn't have time.  He was without any accommodation

11      for the trial as described herein.  He was unable to effectively communicate with his attorney,

12      rendering his presentation of the facts far less "compelling" than the presentation of the opposing

13      party for which he was penalized because the mother's compelling testimony was cited, in part, as

14      the basis for the Court's final decision.

15      76.     Judge Bowers demanded Plaintiff's parents were called back to be present in the Court for

16      the ruling.  She ignored paternal grandmother's testimony that she does not participate in medical

17      appointments,[29] that she doesn't make decisions for the child on Plaintiff's parenting time,[30] and

18      that she doesn't type Plaintiff's messages on Talking Parents.[31]

19             Judge Bowers stated that "[I]t's up to [Plaintiff] to parent this child... and the Court sees

20      that your mother steps in a lot and takes over a lot in that role."[32] She then stated, "I understand

21      that you have the learning disabilities that are a challenge and that she offers you assistance to

22      help deal with those.  But *what the Court heard in the testimony provided* to it was more than just

23      assistance.  What the Court heard is [paternal grandmother] *acting as another parent in the*

24      *household* during your parenting time..."[33]

25

26      [28] *Id.* at 11; 5/23/23 pg. 41 lines 3-10.
        [29] *Id.* at 20; 5/31/24 pg. 142 lines 3-4.

27      [30] *Id.* at 20; 5/31/23 pg. 95 lines 15-20.
        [31] *Id.* at 20; 5/31/23 pg. 95 21-26.

28      [32] *Id.* 5/31/23 pg. 81 lines 23-27.
        [33] *Id.* 5/31/23 pg. 82 lines 4-6.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1   77.    Judge Bowers found that "[Plaintiff] was not the one who did the research on the schools.

2   [Plaintiff] was not the one who – went out and looked for schools for the minor, but rather it was

3   grandmother who did that,"[34] and she addressed paternal grandmother who was shaking her head,

4   NO. Paternal grandmother is not a party to the case and could not respond formally to the Court.

5   78.    Although Title II of the ADA does not support associational discrimination claims, it is

6   notable that paternal grandmother was singled out by the COURT. "What the Court sees is even

7   if Ms. McKinney and Mr. Reedy are able to move on ..using the tools and skills that they learn in

8   co-parenting, that is potentially going to be derailed by [paternal grandmother]'s

9   involvement…"[35] This is in direct contrast to the testimony of plaintiff's therapist who touted the

10  family's "*appropriate support of him in this role and their supportive network for the child.*"[36]

11          Paternal stepfather has accompanied the plaintiff to exchanges and appointments since his

12  first unsupervised exchange given Kayla McKinney's extensive criminal and drug history and

13  false accusations throughout the case, but paternal grandmother offers assistance with

14  communications, and as such, the mother has made extra efforts to isolate plaintiff from her

15  specifically because communication is where he is most disadvantaged. In fact, the mother has

16  asked for a 3111 evaluation from the Court mediator (Rebecca Nelson) and that both

17  grandparents be excluded from the custody evaluation, which is counter productive given that

18  custody evaluations done by professionals who are qualified contact as many collateral contacts

19  as they see fit and specifically will contact the family members who have the most involvement

20  with the child to gather information for their report on the child's welfare. The plaintiff alleges

21  imminent threat of further discrimination and abuse and litigation and threat to the parent-child

22  relationship that will clearly harm both him and the child, who was, by the mother's own words,

23  "inconsolable" the day before the trial when the plaintiff asked the mother to pick her up early

24  due to the family's stress over the prospect of losing contact with her at trial.

25  79.    Judge Bowers' ruling on the issue of school choice limited the plaintiff's constitutional

26

27  [34] *Id.* 5/31/23 pg. 87 lines 24-27.
     [35] *Id.* 5/31/23 pg. 81 lines 13-18.
28  [36] See pg. 14 line 25.

22

1   right to the custody and control of his minor child by granting the mother sole authority to choose

2   the school if the parents couldn't agree.[37]  Yet, she acknowledged that the inability to agree on a

3   school was the reason the parties were at trial.[38]  She then cited *three reasons* upon which the

4   Court made the determination on school choice.

5       "The Court believes that it is in the best interest to select one of the parents to be the

6   designated school selector...the Court recognizes that in selecting one of the parents that it is more

7   likely than not that *the parent is going to choose the school in their district*...the Court recognizes

8   that in making this selection; However, in determining this, *the Court must determine* the parent

9   that is *better able to focus on the needs of the child*; the parent that is *able to acknowledge and*

10  *support the child's relationship with the other parent* and *the parent that is able to research and*

11  *present information to the Court*."[39]  (Emphasis added.)

12      "The Court finds that, *based on the testimony*...Mother is able to focus on the needs of the

13  child; that mother has demonstrated an ability to acknowledge and support the child's relationship

14  with father.  In particular, it was mother's testimony about the *issue of the minor being*

15  *unconsolable (sic)* and mother testifying that *the minor was so upset about the possibility of not*

16  *seeing father again* last Monday...the Court believes that mother has made the progress that she

17  needs to make."[40]And the Court *found her testimony to be credible* about the work she has done

18  to put herself in a place where she can co-parent; that she was able to *identify the skills* that she

19  has learned in co-parenting class, in co-parenting counseling, in the co-parenting books that she

20  has sought out and read; that she was able to *identify the skills* that she uses.  The Court *found her*

21  *testimony to be compelling* on that. And that is why the Court believes that mother, at this point,

22  is able to acknowledge and support the child's relationship with father. And the Court does

23  believe that *mother is able to do the research and present the information to the Court*.[41]

24  80.    Plaintiff alleges that had he been granted reasonable accommodations, he could have

---

25  [37] *Id.* 5/31/23 pg. 86 lines 3-5.

26  [38] *Id.* 5/31/2023 pg. 86 line 5.
    [39] *Id.* 5/31/23 pg. 86 lines 9-19.

27  [40] The plaintiff emphasizes that the Court's conclusions are not supported by the facts; the mother wants sole legal custody and for him to have supervised visitation.  That's why the child was inconsolable. She wasn't going to see

28  her dad.  How could the Court conclude the mother is supporting a relationship between father and the child?
    [41] *Id.* 5/31/23 pg. 87 lines 1-23.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    made a more compelling argument about his ability to co-parent given that he took the same class

2    that mother took, he learned the same skills, and he engaged in the same coparenting counseling,

3    obviously, they attended together. He also gets help with communications in a way that helps

4    mediate his frustration. He could have prepared cross-examination and rebuttal if he had

5    appropriate, effective communication with his attorney. His attorney made it very clear that they

6    were present in court for trial because mother filed the request for order seeking sole legal

7    custody and testified that she wanted the Court to adopt Rebecca Nelson's recommendations for

8    sole legal custody with the plaintiff having supervised visitation.[42]

9        The plaintiff alleges the Court discriminated against him on the basis of his disabilities

10   and ignored the facts of the case in an effort to justify granting the mother school choice.

11       •   PLAINTIFF'S FORMAL ALLEGATIONS OF JUDICIAL BIAS

12   81.   The plaintiff alleged violations of the ADA in several declarations and cited violations of

13   *Carney* and Cal. Fam. Code §3049 in his motion for reconsideration filed in the court on June 12,

14   2023. On August 24, 2024, Judge Bowers heard the case. She invited the mother to speak freely

15   and even apologized to her when she interrupted the mother's statement. Judge Bowers

16   repeatedly interrupted the plaintiff and made derogatory statements that he was complaining of

17   "inconvenience" when he was trying to explain that the distance of the school was unfair to the

18   child because he can't fully participate on the campus.[43]

19       Judge Bowers would not allow him equal opportunity to state his position on the record.

20   The plaintiff alleges this is a violation of due process that is motivated by conscious disregard for

21   his rights and that it is based on Judge Bowers discriminatory view of him as a less significant

22   parent due to his disabilities and that her demeanor toward him in the hearing was dismissive and

23   demeaning. She only ascribes 'inconvenience' to the plaintiff's arguments but never to the

24   mother's when the mother has already stated in Court that driving was going to be a problem

25   because she had another baby.

26       The hearing took place on Zoom, and the plaintiff didn't have direct access to alert his

27   _____

28   [42] Id. at 23; 5/24/2023 pg. 7 lines 24-27.
     [43] Cert. Trans. 8/24/23 Pg. 21 lines 15-23.

24

1   attorney to the issue he wanted to raise during the mother's testimony.  There were multiple

2   people talking, which was too much interference for the plaintiff given his processing deficit.

3   Judge Bowers was insensitive to his needs and did not consider his individualized needs despite

4   being well-informed of his disabilities.

5          Paternal grandmother was present to assist the plaintiff as a support advocate but was

6   instructed she could not intervene in any way when his accommodations were granted.  She sat

7   quietly and observed without helping.  Therefore, the accommodations proved to be ineffectual.

8   82.    In response, Judge Bowers stated, "The assertions raised by [plaintiff] in his declaration

9   are the Court erred in designating the respondent as a designated selector based on his learning

10  disabilities. Nothing could be further from the truth.  The Court did not make its ruling based on

11  Mr. Reedy's learning disabilities.  Even further, the law cited **supports the Court's position** that a

12  handicap or a condition may be considered **where the Court determines** it will have a **substantial**

13  **and lasting adverse effect** on the best interests of the child.  That's the case of In *re Marriage of*

14  *Carney*. The Court does not have the cite for that case.  However, as the Court stated, the Court

15  **did not take into consideration [Plaintiff's] learning disabilities** with regard to making its

16  decision of who should be the **final decider on selecting a school**."[44]

17  83.    Plaintiff alleges that Judge Bowers ignored public policy, controlling caselaw, the ADA,

18  and federal regulations and state laws when she failed to consider his "individualized needs" and

19  failed to consider the help that he was receiving from paternal grandmother in the context of his

20  disabilities.  There was no evidence that she was "acting as another parent" on his parenting time.

21  There was significant evidence that she was assisting him with tasks related to researching school

22  performance metrics, evaluating GreatSchools data, and gathering travel times and distances to

23  school locations to put into a spreadsheet, which is practical, reasonable help for a person with

24  learning disabilities.

25  84.    The plaintiff also alleges discrimination in a prior hearing.  On January 23, 2023, Judge

26  Bowers heard the El Dorado County Dept. of Child Support's motion for rehearing on a motion

27

28  [44] *Id.* 8/24/2023 pg. 15 lines 3-17.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    Plaintiff filed in 2022 seeking financial relief through CalWORKs.

2        Under Cal. Fam. Code § 3086, Plaintiff could be designated the parent eligible to apply for

3    public assistance benefits on behalf of the child. Plaintiff alleges that JUDGE BOWERS did not

4    consider his "*individualized needs*" on a "*case-by-case basis*" when she denied his motion. The

5    mother had been receiving public benefits and had already obtained a bachelor's degree, was

6    working on a post-graduate degree, and had become pregnant with a second child and moved into

7    a new home with her cohabiting boyfriend. Judge Bowers failed to consider the totality of

8    circumstances including the mother's resources and earning capacity, Plaintiff's equal

9    responsibility for caring for the child and his lack of opportunity and earning capacity due to his

10   disabilities. She recommended he continue to seek services from the Department of

11   Rehabilitation and from other programs that "*do not involve the minor*," treating him as an

12   undeserving, unequal parent.

13        • 42 U.S.C. § 1983 DUE PROCESS AND EQUAL PROTECTION VIOLATIONS

14   85.    Plaintiff alleges that on November 28, 2022, his right to due process was violated when

15   the Court failed to process his MC-410 Request for Accommodation prior to the hearing.

16   Pursuant California Rules of Court, Rule 1.100 (e)(2): "The court must promptly inform the

17   applicant of the determination to grant or deny an accommodation request."

18   86.    Plaintiff alleges that on May 23, 24, and 31, 2023, his right to due process and equal

19   protection were violated when the Court denied his request for accommodation for a three-day

20   trial leaving him without the ability to take effective notes that would enable him to confer with

21   his attorney on testimony of witnesses to prepare for cross-examination. The California Rules of

22   Court, Rule 1.150. (d) states: "The judge may permit inconspicuous personal recording devices to

23   be used by persons in a courtroom to make sound recordings as *personal notes of the*

24   *proceedings*. A person proposing to use a recording device must obtain advance permission from

25   the judge. The recordings must not be used for any purpose other than as personal notes."

26   Plaintiff alleges that he was denied a request for a reasonable accommodation that is permissible

27   and that the ADA Coordinator should have referred his request to the judge for approval or

28   advised Plaintiff that he would need to speak with the family law facilitator to get help with his

26

1    request. Plaintiff wasn't aware of the rule at the time of the occurrence and was not referred by

2    the Court staff to the facilitator's office to get help on how he could proceed to obtain the

3    necessary permission.

4    87.    Plaintiff alleges that on December 15, 2023, his rights to due process and equal protection

5    were violated when the Court failed to process his MC-410 Request for Accommodation. He

6    later obtained a copy of the approved application that was date-stamped the day before the

7    hearing. However, the transcript of the hearing substantiates that the Court did not provide the

8    plaintiff with accommodations.

9    88.    The plaintiff alleges that the Court acted with conscious disregard to his rights as a

10    disabled person when they filed the MC-410 application the day prior to the hearing. If his

11    attorney had not raised the issue in open court, there would be no record of the continuing

12    violations.

13        • 42 U.S.C. § 1983 FOURTEENTH AMENDMENT – PERSONAL CAPACITY

14    89.    The plaintiff repeats and realleges every allegation in this Amended Complaint. He

15    alleges violations of his Fourteenth Amendment rights by Judge Bowers and Rebecca Nelson in

16    their individual capacities as state actors under color of state law.

17    90.    Plaintiff alleges that Rebecca Nelson acted under color of state law when she refused to

18    follow the California Rules of Court that govern her behavior as a mediator. Plaintiff did not

19    know the Rules of Court until after the second interview. His Memorandum of Points and

20    Authorities and Reply Declaration (Exhibit A) describe how by her actions under this authority,

21    she deprived him of due process and equal protection of the law.

22    91.    Plaintiff alleges that Rebecca Nelson caused, and continues to threaten, deprivation of his

23    constitutionally protected liberty interest in the care, custody, and control of his child including

24    his ability to direct her education.

25    92.    Rebecca Nelson testified that interviewing a young child was harmful and then required

26    the plaintiff's child to be interviewed without good cause. The harm to the child is also harmful

27    to the Plaintiff because under color of state law Rebecca Nelson can act with this level of

28    authority, and he is unable to protect his daughter from her actions. The plaintiff thus alleges that

27

1   her actions were "for purposes of oppression." (quoting *Daniels v. Williams*[45] (1986)) and

2   constitute conscious disregard for his rights as a disabled person.

3   93.   Plaintiff alleges that without Rebecca Nelson's first biased CCRC report, the only issue

4   properly before the Court would have been the matter of where the child would attend school and

5   that he would not have required testimony of experts to re-litigate custody and visitation. "It is

6   well established that the courts are reluctant to order a change of custody and will not do so

7   except for imperative reasons; that it is desirable that there be an end of litigation and undesirable

8   to change the child's established mode of living." (*In Re Marriage of Carney* (1979). Thus,

9   Plaintiff alleges her actions are the proximate cause of a three-day trial and that the Court's

10   actions violate state and federal laws.

11      Plaintiff lost a protected property interest in the money he borrowed for the cost of legal

12   expenses relating to pre-trial motions, trial prep, the trial itself, and post-trial motions, and the

13   continuing litigation that ensued when Judge Bowers claimed the Court may have been thinking a

14   5-5-2-2 schedule was best during the August 24, 2023 hearing.

15      The plaintiff has filed a Notice of Appeal and is attempting to appeal the decision due to

16   the irregularity in the proceedings where he was denied accommodations which prejudiced his

17   case, and due to the discrimination he faced in the CCRC interview process that prejudiced his

18   case, and due to ongoing judicial bias.

19   94.   The plaintiff alleges that Judge Bowers acted under color of state law to deprive him of

20   equal protection and due process when she conveyed the authority bestowed on the Court by the

21   California Constitution to adjudicate facts and determine the child's best interest to the mother.

22   Judge Bowers granted the mother sole discretion to choose the child's school if the parties

23   couldn't agree. The Court had already determined that the parties were at an impasse.[46]

24   95.   Judge Bowers failed to provide a mechanism for a review hearing on the matter of school

25   choice after ordering the parties to meet and with their coparenting counselor. She refused to hear

26   the plaintiff's motions regarding the matter after the parties made an unenforceable agreement in

27

28   [45] 474 U.S. 327, 331.
     [46] Cert. Trans. 5/31/2023 pg. 86 line 5.

1    counseling that resulted in the child's enrollment in a midway school with afterschool care.

2        Thus, the plaintiff was denied due process and equal protection of the law and deprived of

3    his liberty interest in maintaining equal authority to direct his daughter's education and to be

4    equally involved in her education where the distance is a deterrent to full participation.

5        In addition, Judge Bowers has encouraged the mother to pursue a vexatious litigant claim

6    to impose a chilling effect on his involvement in the proceedings.

7    96.    Plaintiff alleges there is imminent danger that the Court will continue to impair his rights

8    to due process and equal protection of the law pursuant the Fourteenth Amendment and the

9    California Constitution and thereby will further deprive him (and his child) of the fundamental

10   liberty interest in maintaining the parent-child relationship.  Parents and children possess a

11   constitutionally protected liberty interest in companionship and society with each other. *Smith v.*

12   *City of Fontana*[47] (9th Cir. 1987).

13       The Ninth Circuit has held that a parent's liberty interest is neither binary nor automatic,

14   but rather becomes judicially enforceable only when the parent "demonstrates a full commitment

15   to the responsibilities of parenthood by coming forward to participate in the rearing of [the]

16   child." *Kirkpatrick v. Washoe County*[48] (9th Cir. 2016) (en banc).  Plaintiff has demonstrated a

17   full commitment to his child by filing the Petition to Establish a Parental Relationship before the

18   child was born and by borrowing extensively to continue to litigate in this biased court.

19       Plaintiff alleges that his liberty interest…in the "care, custody, and control" of his

20   child…is "perhaps the oldest of the fundamental liberty interests recognized by [the U.S.

21   Supreme Court].  In light of this extensive precedent, it cannot now be doubted that the Due

22   Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make

23   decisions concerning the care, custody, and control of their children. *Troxel v. Granville*[49] (2000).

24       **Damages**

25   97.    ADA § 203, 42 U.S.C. § 12133 (1994) (providing for enforcement under 29 U.S.C. §

26

27   _____
     [47] 818 F.2d 1411, 1418.
     [48] 843 F.3d 784, 789.
28   [49] 530 U.S. 57, at 65-6.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1 794a (1994)) states: (a)

2      (1)The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of

3 1964 (42 U.S.C. 2000e–16), including the application of sections 706(f) through 706(k) (42

4 U.S.C. 2000e–5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e–

5 5(e)(3)) to claims of discrimination in compensation), shall be available, with respect to any

6 complaint under section 791 of this title, to any employee or applicant for employment aggrieved

7 by the final disposition of such complaint, or by the failure to take final action on such complaint.

8 In fashioning an equitable or affirmative action remedy under such section, a court may take into

9 account the reasonableness of the cost of any necessary work place accommodation, and the

10 availability of alternatives therefor or other appropriate relief in order to achieve an equitable and

11 appropriate remedy.

12      (2)The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of

13 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C.

14 2000e–5), applied to claims of discrimination in compensation) shall be available to any person

15 aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of

16 such assistance under §794 of this title.

17      (b) In any action or proceeding to enforce or charge a violation of a provision of this

18 subchapter, the court, in its discretion, may allow the prevailing party, other than the United

19 States, a reasonable attorney's fee as part of the costs.

20 98.    Plaintiff's alleges he incurred property damages as a direct and proximate result of the

21 actions of the Court. He borrowed and paid litigation costs for pre-trial hearings, trial preparation,

22 a three-day trial, post-trial motions including the most recent motion to change the schedule and

23 the vacation time that was brough up in the last interview.  He is using an estimate of $40,000 for

24 litigation costs although he anticipates incurring additional expense for appellate review.

25 99.    Plaintiff estimates property damages resulting from the trial outcome to be $250.00 per

26 month for transportation to and from Roseville ongoing.  He is unable to take up any child

27 support issues while the mother is on Cash Aid.  He has been threatened with vexatious litigation

28 which has put a chilling effect on his ability to request relief under §3086 again.

1  100.   Plaintiff's proximate property damages encompass the inability to access CalWORKs

2  benefits from the date of filing his Cal. Fam. Code § 3086 motion. Plaintiff, an impoverished

3  single parent, experiences severe financial hardship exacerbated by the mother's receipt of public

4  benefits when she is able to work with high earning capacity and opportunity.  Despite her

5  continued eligibility for assistance, Plaintiff contends her pursuit of higher education and personal

6  situation contrasts starkly with his own.

7  101.   Plaintiff has endured and continues to endure mental anguish and emotional distress

8  stemming from the violations of his civil and constitutional rights detailed herein.

9  102.   Plaintiff experiences mental anguish due to the fear of further impairment or loss of the

10  parent-child relationship, which is constantly under threat by the alleged indifference,

11  insensitivity, and unethical conduct of Defendants Judge Bowers, Rebecca Nelson, and the El

12  Dorado County Superior Court. There exists a potential scenario where violations of Plaintiff's

13  civil rights may result in an unjust perception of willful abandonment of his parental role, despite

14  his inability to sustain ongoing litigation due to exacerbated costs and duration of proceedings

15  imposed by the Court.

16    •   28 C.F.R. §§ 35.170–35.189 (2002).

17  103.   The plaintiff filed a formal complaint with the Department of Justice and received a letter

18  stating they would not take on the case due to the burden of their existing caseload but the letter

19  states it does not reflect the merits of his complaint.

20  **Causes of Action**

21    **First Cause of Action – Violations of Cal. Fam. Code §3049**

22  104.   The plaintiff repeats and realleges every allegation in this Amended Complaint and

23  alleges that there are multiple violations of § 3049 presented in the factual background that are

24  coincident with other violations that may not be enumerated here.

25  105.   The California Supreme Court's holding in Re Marriage of Carney 1979 was codified into

26  law as §3049.  The plaintiff alleges that the Superior Court ignored the tenets of the law and the

27  construing caselaw and in doing so, violated his rights as a disabled parent.

28  106.   Rebecca Nelson failed to presume the plaintiff was fit despite over four years of joint

31

1    equal custody established by stipulation in the same court in 2019. Disability alone should not
2    presume parental unfitness. The Court was willing to adopt her recommendations, and in doing
3    so, the Court is complicit in violating this section of the family code.

4         In forming her recommendations and expert opinion, Rebecca Nelson relied on outdated
5    stereotypes based on "presumptions as to what a class of individuals with [learning] disabilities
6    can or cannot do."

7         In determining the child's best interest, Judge Bowers ignored important elements of
8    paternal grandmother's testimony and concluded that paternal grandmother was "acting as
9    another parent" based on "presumptions as to what a class of individuals with [learning]
10   disabilities can or cannot do." "The Court's preconception, wholly apart from its outdated
11   presumption of proper gender roles,[50] also stereotypes the plaintiff as a person deemed [] unable
12   to be a good parent simply because he is physically handicapped. Like most stereotypes, this is
13   both false and demeaning." (quoting *In Re Marriage of Carney* (1979)).

14        The California Supreme Court underscored the importance of providing reasonable
15   accommodations to disabled parents to enable them to fully participate in custody and visitation
16   proceedings. The Court did not provide reasonable accommodations for the trial and did not
17   ensure the plaintiff's equal access to justice or ensure that as a disabled parent he was not unfairly
18   disadvantaged in the custody dispute.

19   107.   The Court failed to take into account the specific nature and extent of the plaintiff's
20   disability or to recognize the unique circumstances of his family and to "consider the family as a
21   whole" as the Supreme Court instructed. *In Re Marriage of Carney* (1979).

22   108.   Consistent with the *Carney* decision are the standards set by the Ninth Circuit and the
23   state legislature enforcing continuity and stability.

24        **Second Cause of Action – Violations of Title II Americans with Disabilities Act (1990)**
25   109.   The plaintiff repeats and realleges each and every allegation contained in the preceding
26   paragraphs of this Amended Complaint.

27   _____

28   [50] Rebecca Nelson also testified that "generally the mother will take over and participate in all the education and let
     dad know what's going on," demonstrating gender bias, as well as discriminating on the basis of disability.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1        1.    Barrier to Effective Communication

2    110.    Under Title II, public entities are required to ensure effective communication with

3    individuals with disabilities. In relevant part, Title II requires the provision of auxiliary aids and

4    services to ensure that communication with individuals who have "communication-related

5    disabilities" is as effective as communication with individuals without disabilities.

6    111.    ADA Title II § 202, 42 U.S.C. § 12132 (1990): "[N]o qualified individual with a disability

7    shall, by reason of such disability, be excluded from participation in or be denied the benefits of

8    the services, programs, or activities of a public entity, or be subjected to discrimination by any

9    such entity."

10    112.    The plaintiff alleges that a neuroperceptual learning disability is a communication-related

11    disability. He further alleges that he had barriers to effective communication due to the Court's

12    failure to allow him the use of an auxiliary aid in the form of a Live Scribe pen to ensure he could

13    hear and process testimony at trial. Without the use of an auxiliary aid, he did not have effective

14    communication with the Court, with his attorney, and in the normal course of the trial, he was

15    unable to process what was said and effectively prepare for cross-examination and rebuttal.

16        2.    Americans with Disabilities Act Training and Enforcement

17    113.    Plaintiff alleges that defendants Judge Bowers, Rebecca Nelson, and the Court staff did

18    not have the sensitivity training necessary to interact appropriately with the plaintiff.

19    114.    The plaintiff alleges that defendants Judge Bowers, Rebecca Nelson, and the Court

20    violated his civil rights by not being adequately responsive to his needs.

21    115.    The plaintiff alleges that the Court does not have an efficient and effective administrative

22    procedure for receiving, reviewing, and processing accommodations timely.

23        3.    Failure to Provide Reasonable Accommodations

24    116.    Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5)(A) The process of identifying

25    and implementing an effective reasonable accommodation requires creative problem solving and

26    a true individualized assessment, as the appropriate accommodation depends on the functional

27    limitations of the individual, the nature of the program or service in which they are participating,

28    and the sensitivity and professionalism of other parties involved.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

117.    The plaintiff alleges that defendants Judge Bowers, Rebecca Nelson, and the Court failed to provide reasonable accommodations as described in the complaint.  Despite the plaintiff's communication of his disabilities and requests for accommodations to access the services provided (and mandated) by the Court, the Defendants either failed to respond timely; failed to forward a request to the appropriate personnel; failed to engage in an interactive dialogue; denied reasonable accommodations in whole; prescribed accommodations that were ineffective; and/or failed to allow the plaintiff to utilize accommodations thus rendering them ineffective.

The plaintiff alleges that the ongoing pattern of behavior by the Court demonstrates a conscious disregard for the plaintiff's federally protected rights as a disabled person.

The plaintiff alleges he was denied access to the courts when his request for accommodation to have documents emailed to him were denied.  The drive to and from the Court is approximately 50 minutes each way.  When the midway point for exchanges was in the same direction, he could coordinate exchanges with Court business to limit overall time in the car.

Neither parent lives in El Dorado County as of August 2022.  Since January 26, 2023, the exchanges take place at the child's school or at a midway point between Roseville and Sacramento off Hwy. 80.  The drive to and from this Court on Hwy. 50 is in addition to the plaintiff being forced to drive approximately 45 minutes each way to and from the child's school for exchanges due to the outcome of the trial.  The distance to the school precludes him from frequently participating in the child's education.  In addition, the plaintiff has informed the Court that the excessive driving has placed an undue burden on him due and exacerbates his orthopedic/lumbar disabilities and requested the Court email him conformed documents and minute orders or documents generated by the Court. The plaintiff has experience prolonged delays in obtaining and reviewing court documents that could be provided to him electronically.

118.    The nondiscrimination requirement of 28 C.F.R. Part 35 relating to public services provides that public accommodations must provide *full and equal* enjoyment of the goods, services, facilities, privileges, advantages, or accommodations.  It is impermissible to deny participation, to participation of unequal benefit, or to provide activities separately, unless it is necessary to do so to provide the activity as effectively.  [28 C.F.R. §§ 35.130, 35.149].

1

**Third Cause of Action**

2 • Violations of §505 Rehabilitation Act of 1973 and other Federal Regulations

3 ○ 29 U.S.C. § 794 [Section 505]- failure to take appropriate steps to ensure

4 communication with the plaintiff was as effective as communications with others

5 No otherwise qualified handicapped individual in the United States ... shall, solely by

6 reason of his handicap, be excluded from participation in, be denied the benefits of, or be

7 subjected to discrimination under any program or activity receiving Federal financial assistance...

8 [29 U.S.C. § 794]. "Program or activity" means all of the operations of a department, agency,

9 special purpose district, or other instrumentality of a State or of a local government [29 U.S.C.

10 §794 (1)(A)].

11 To help effectuate these statutory mandates the Department of Justice (DOJ) under the

12 authority of 42 U.S.C. §12134(a) promulgated regulations regarding the responsibilities of state

13 and local government to disabled persons,..." *Ferguson v. City of Phoenix* (9th Cir. 1998). "The

14 regulations further provide that a public entity shall 'take appropriate steps to ensure that

15 communications with applicants, participants, and members of the public with disabilities are as

16 effective as communications with others.' 28 C.F.R. §135.160(a)..." *Id.*

17 ○ Failure to recognize the plaintiff's individualized needs - 28 C.F.R. § 35.130(b)

18 119. Under federal regulations, individuals with disabilities must be treated on a ***case-by-case***

19 ***basis*** consistent with ***facts and objective evidence***. (See, e.g., 28 C.F.R. § 35.130(b); see also 28

20 C.F.R. pt. 35, App. B (explaining in the 1991 Section-by-Section guidance to the Title II

21 regulation that, "[t]aken together, the[] provisions [in 28 C.F.R. § 35.130(b)] are intended to

22 prohibit exclusion ... of individuals with disabilities and the denial of equal opportunities enjoyed

23 by others, based on, among other things, presumptions, patronizing attitudes, fears, and

24 stereotypes about individuals with disabilities. Consistent with these standards, public entities are

25 required to ensure that their actions are **based on facts applicable to individuals** and **not**

26 **presumptions as to what a class of individuals with disabilities can or cannot do**."); *School*

27

28

1    *Bd of Nassau County v. Arline*[51] (1987)). Furthermore, individuals with disabilities must be
2    provided opportunities to benefit from or participate in child welfare programs, services, and
3    activities that are equal to those extended to individuals without disabilities. (See 28 C.F.R. §§
4    35.130(b)(l)(ii)-(iv), (vii), (b)(7); 45 C.F.R. § 84.4(b) (l)(ii)-(iii); see also 28 C.F.R. §
5    42.503(b)(l)(ii), (iii)). This principle can require the provision of aids, benefits, and services
6    different from those provided to other parents and prospective parents where necessary to ensure
7    an equal opportunity to obtain the same result or gain the same benefit. (See, e.g., 28 C.F.R. §
8    35.130(b)(l)(ii)-(iv)).

9    120.    The plaintiff alleges that Judge Bowers did not treat him on a case-by-case basis
10   consistent with facts and objective evidence on many occasions. One instance is when she
11   ignored the evidence in a child support hearing where the plaintiff requested financial relief under
12   Cal. Fam. Code §3086 as described in paragraph 84. Another instance is when Judge Bowers
13   ignored essential elements of paternal grandmother's testimony and erroneously concluded that
14   paternal grandmother was "acting as another parent" and that he was not making decisions for his
15   daughter. She ignored that he had "individualized needs" with regard to the school research on
16   performance metrics and erroneously concluded that he had not fully participated in the selection
17   of the schools. She also ignored his "individualized needs" at trial when could not refer to any
18   written materials to refresh his memory on the names, locations, and times/distances of the
19   schools, among other questions, which jeopardized his testimony. The plaintiff alleges Judge
20   Bowers was aware of the denial of reasonable accommodations for the trial and that she
21   proceeded without allowing him to review documents, which he had stated that he would need do
22   to answer the questions accurately, if given the time allowed.

23   121.    The plaintiff was denied provision of aids, benefits, and services where necessary to
24   ensure an equal opportunity to obtain the same result or gain the same benefit in violation of
25   federal regulation 28 C.F.R. § 35.130.

26   122.    The plaintiff can provide written documents to the Court more effectively than in a

27

28   [51] 480 U.S. 273,285.

1  hearing. This is another example of her ignoring his individualized needs on a case-by-case basis.
2  The plaintiff alleges Judge Bowers has acted toward him with animus and that he has an ongoing
3  conflict with her regarding judicial bias and her desire to have him classified a vexatious litigant.
4  The plaintiff is aware of at least one other disabled father who was found vexatious on an interim
5  order pending a trial that was canceled. The plaintiff feels threatened by her animus toward him
6  and her willingness to ignore objective evidence of his ability to parent over the last five years.
7  123.    Plaintiff alleges that defendants Judge Bowers and Rebecca Nelson discriminated against
8  him on the basis of his disabilities when they failed to acknowledge that the Court had already
9  decided that there were *no long-term adverse effects on the child resulting from his disabilities*.
10 Plaintiff provides the first CCRC report, the first custody determination at the trial on May 22,
11 2019, and the duration of joint custody as evidence that he is not harmful to his child.

12     At trial on May 23, 2023, the Court took judicial notice of the CCRC report dated October
13 1, 2018 in which Ms. Neustadter stated, "The undersigned *does not believe [plaintiff] poses any*
14 *physical or emotional threat* to Ms. McKinney or his child. *Ms. McKinney may pose an*
15 *emotional threat to [plaintiff] and the baby based on her lack of cooperation* with Mr. Reedy's
16 desire to actively parent."[52]

17                              **Fourth Cause of Action**

18     •   Violations of § 504 Rehabilitation Act of 1973 and other Federal Regulations
19 124.    § 504 prohibits anyone from interfering with the exercise of rights granted by the law to
20 individuals with disabilities and prohibits discrimination on the basis of handicap in federally
21 assisted programs and activities.

22     Section 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of
23 1964, which "prohibits recipients from intimidating, threatening, coercing, or discriminating
24 against any individual for the purpose of interfering with any right or privilege . . . or because
25 [Plaintiff] has made a complaint, testified, assisted, or participated in any manner in an
26 investigation, proceeding or hearing under this part."

27

28  [52] CCRC Report dated 10/1/2018 pg. 7 lines 12-14.

34 C.F.R. §104.61 and 34 C.F.R. § 100.7(e). The Americans with Disabilities Act (ADA) provides, "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by" the ADA. 42 U.S.C. § 12203(a).

Because section 504 uses an anti-retaliation clause that is functionally identical to the ADA, they are generally analyzed together. Individuals who have "opposed any act or practice made unlawful" by Title II of the ADA have standing to sue under the anti-retaliation provisions of the ADA. *Barker v. Riverside Cty. Office of Educ.*,[53] (9th Cir. 2009).

125. Plaintiff alleges violation of § 504 of the Rehabilitation Act and violations of federal regulations as described herein.

Plaintiff alleges that Judge Bowers threats of finding him a vexatious litigant are retaliatory because of his complaints of judicial bias, and he is seeking injunctive relief to avoid further conflict with her over this issue.

The plaintiff alleges that Rebecca Nelsons's demand to interview the plaintiff's child was retaliatory because her report was obstructed by his motion in limine to exclude prejudicial hearsay and the mother did not prevail at trial when the Court rejected Rebecca Nelson's recommendations to strip him of legal custody and relegate him to supervised visitation.

126. Plaintiff requests only equitable damages resulting from retaliation. (See Prospective Injunctive Relief).

### Fifth Cause of Action

- Cause of Action for Fourteenth Amendment Due Process Violation

127. The plaintiff brings forth this cause of action against Defendants Judge Bowers, Rebecca Nelson, and the El Dorado County Superior Court pursuant to the Fourteenth Amendment §1, which prohibits states from depriving any person of life, liberty, or property without due process of law, and Title 42 U.S.C. § 1983, which provides a mechanism for redress when such deprivations occur under color of state law.

128. The plaintiff repeats and realleges every allegation in this Amended Complaint. He

---

[53] 584 F.3d 821, 827.

1  alleges that Defendants Judge Bowers and Rebecca Nelson, acting under color of state authority,

2  deprived him of his rights secured by the Constitution of the United States, including both

3  substantive and procedural due process as guaranteed by the Fourteenth Amendment as described

4  in paragraphs 85-95 and throughout this complaint.

5  129.   The plaintiff contends that on September 9, 2022, Rebecca Nelson sought to antagonize

6  and threaten Plaintiff in the CCRC interview. She failed to seek balanced collateral contacts. She

7  relied on input from one side of the conflict and prejudicial, out-of-court statements to support her

8  position that the plaintiff was not making decisions about the child. In doing so, she exacerbated

9  a power imbalance between the parties. Rebecca Nelson coerced the plaintiff into signing a

10  HIPAA form for medical records when she could have looked up his therapist's phone number to

11  speak with him directly.

12  130.   Rebecca Nelson's actions demonstrate her deliberate bias against the plaintiff and intent to

13  strip him of his legal custody rights and restrict his visitation with his child.

14  131.   Judge Bowers neglected to schedule a date for the parties to return after ordering them to

15  meet and confer. She abdicated the court's authority to determine the best interest of the minor

16  regarding school selection to the mother. This failure resulted in an unequal treatment of the

17  parents and unfairly appointed the mother as the sole decision-maker without a substantial state

18  purpose. Judge Bowers actions deprived the plaintiff of his constitutionally protected liberty

19  interest in exercising "care, custody, and control" of his child and directing her education.

20  132.   The subsequent denial of consideration of his disabilities by the Court, under the guise of

21  equal treatment under the law, further infringed upon his substantive due process rights

22  guaranteed by the Fourteenth Amendment.

23  133.   As a direct and proximate result of the unlawful acts of Defendants Judge Bowers and

24  Rebecca Nelson, Plaintiff suffered damages including but not limited to emotional distress,

25  financial burden, and infringement upon his parental rights.

26  134.   Plaintiff seeks redress for the denial of his constitutionally protected property interest,

27  which resulted from excessive litigation costs. These costs were primarily driven by the CCRC

28  report issued September 27, 2022 leading to a prolonged trial for custody, visitation, school

1    choice, and other matters.  Litigation costs were further exacerbated by Judge Bowers' statement

2    on August 24, 2023 that the Court may have been thinking that a 5-5-2-2 schedule would be best

3    when, in fact, that schedule was never even been raised at the trial.  This resulted in the mother

4    filing for a change in the schedule prompting another CCRC interview, further litigation, and an

5    unnecessary and harmful interview with the plaintiff's five-year-old daughter.  The new

6    recommendations include appointment of minor's counsel which will further embroil the child in

7    coparenting issues and involvement with the Court.

8                                   **Sixth Cause of Action**

9        • 42 U.S.C. §1983: Violation of Fourteenth Amendment – Equal Protection

10   135.    Plaintiff repeats and realleges each and every allegation contained in the preceding

11   paragraphs of this Amended Complaint.

12   136.    Pursuant to the Equal Protection Clause of the Fourteenth Amendment, which mandates

13   that a governmental body may not deny individuals equal protection under its governing laws and

14   requires the state to treat individuals in the same manner as others in similar conditions and

15   circumstances, and in accordance with Title 42 U.S.C. § 1983, which offers recourse when such

16   deprivations arise under the guise of state authority, the plaintiff initiates this cause of action

17   against Defendants Judge Bowers, Rebecca Nelson, and the El Dorado County Superior Court.

18   137.    The Fourteenth Amendment's Equal Protection Clause mandates that "no State shall

19   deprive any person within its jurisdiction of the equal protection of the laws," ensuring that all

20   individuals in similar circumstances are treated similarly. It is established in legal precedent such

21   as *F. S. Royster Guano Co. v. Virginia[54]* (1920), that the Constitution does not require treating

22   things that are inherently different as though they were the same, as held in *Tigner v. Texas[55]*

23   (1940). The determination of what constitutes "different" or "the same" initially lies with the state

24   legislatures (citing *Plyler v. Doe* (1982)).[56]

25   138.    In the instant case, the Court's awareness of the plaintiff's disabilities underscores the

26

27   ───────────────
     [54] 253 U. S. 412, 253 U. S. 415.
     [55] 310 U.S. 141, 310 U. S. 147.
28   [56] 457 U.S. 202.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1   recognition of dissimilar circumstances. However, despite this awareness, the Court discriminated
2   against the plaintiff under the Americans with Disabilities Act and other relevant laws and
3   regulations multiple times as described throughout this complaint.

4   In one instance, during the trial in May 2023, the Court concluded that the plaintiff had
5   not conducted research on schools without considering his individualized needs as a disabled
6   person, and subsequently appointed the mother as the sole authority regarding the child's best
7   interest, which is purportedly without substantial state purpose and violates the principle of equal
8   treatment under the law.

9   139.   As a direct and proximate result of the unlawful acts of each and every one of the
10   defendants named herein, Plaintiff suffered damages as described in paragraphs 97-102.

11   **Seventh Cause of Action**

12   • Violation of California Constitution, Art. I, §7 – Due Process

13   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs
14   of this Complaint. Each violation of the due process clause of the fourteenth amendment is also a
15   violation of the California Constitution which states in relevant part, that "A person may not be
16   deprived of life, liberty, or property without due process of law or denied equal protection of the
17   laws…"

18   140.   The plaintiff alleges that Judge Bowers and Rebecca Nelson, the defendants named
19   herein, in their official capacities and as individuals, acting under color of state authority,
20   deprived the plaintiff of his rights, privileges, and immunities secured by the Constitution of
21   the United States.

22   **Eigth Cause of Action**

23   • Violation of California Constitution, Art. I, §7 – Equal Protection

24   141.   The plaintiff repeats and realleges each and every allegation contained in the preceding
25   paragraphs of this Complaint. Each violation of the equal protection clause of the fourteenth
26   amendment is also a violation of the California Constitution which states in relevant part, that "A
27   person may not be deprived of life, liberty, or property without due process of law or denied equal
28   protection of the laws…"

1   142.   The plaintiff alleges deprivation of constitutionally protected liberty and property interests

2   described herein and alleges that the actions of Defendants Judge Bowers and Rebecca Nelson

3   were malicious and for the "purpose of oppression." Defendants actions affecting the plaintiff

4   that are described herein were committed with conscious disregard to his rights protected by the

5   California Constitution.

6   143.   The integrity of the judiciary depends on the integrity of the individuals carrying out the

7   day-to-day duties of the Court. Judge Bowers is sworn to protect the rights of individuals.

8   Rebecca Nelson is accorded significant power to make recommendations as the Court's expert

9   witness. The actions of a State official to discrimination against an individual on the basis of

10  disability in their official capacity is in direct conflict with the superior authority of the California

11  Constitution and violates their oath of office. Official conduct violates substantive due process

12  when it "shocks the conscience." *Gantt v. City of Los Angeles*,[57] (2013).

13  144.   As a direct and proximate result of the unlawful acts of the Defendants named herein, the

14  plaintiff suffered damages as described on paragraphs 97-102.

### Ninth Cause of Action

16  • Violation of California Civil Code §§ 51(f), 54(c), and 54.1(d)

17  145.   Plaintiff repeats and realleges every allegation in this Amended Complaint. Plaintiff

18  alleges the violations of the ADA Title II. Any violation of the ADA, including Title II, is

19  incorporated as a violation of California law, per Civil Code §§ 51(f), 54(c), and 54.1(d). Treble

20  damages are available for conscous disregard for the rights and/or safety of disabled persons

21  under Cal. Civil Code § 54.3.

### V.   Requested Relief

### • Remedies for Deliberate Indifference / Conscious Disregard

24  146.   The plaintiff alleges the Court was aware of the access barriers and communication

25  barriers and continued denial of access. Deliberate indifference to the discriminatory effect upon

26  the plaintiff and to his rights as a disabled person is a form of intentional discrimination which the

27

28  ───────────

[57] 717 F.3d 702, 707 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

1  plaintiff argues justifies damages under Title II of the ADA. *Duvall v. County of Kitsap*[58] (9th Cir.

2  2001).

3  147.   The plaintiff alleges the Court, and specifically Judge Bowers and Rebecca Nelson,

4  repeatedly acted with "conscious disregard" for his rights as a disabled person. He further alleges

5  that Judge Bowers and Rebecca Nelson acted with intent and with animus toward him as

6  described herein and as a result, plaintiff requests treble damages pursuant to California Civil

7  Code § 54.3.

8  • **Injunctive Relief: Title II – Official Capacity**

9  148.   Judge Bowers has been assigned the family law department since January 21, 2022.

10  Plaintiff alleges she violated his civil rights as described herein and that there is an imminent risk

11  of being required to have her adjudicate his family law case indefinitely.

12  149.   Plaintiff alleges Rebecca Nelson violated his civil rights as described herein and that he

13  has a substantial risk of being required to interview with her again. He is also concerned with

14  interviewing with any Child Custody Recommending Counselor in the same courthouse for a

15  3111 evaluation.

16       There have been six mandated CCRC interviews between 2018 and 2024. The opposing

17  party refuses to stipulate to changing venue to another county; she has repeatedly filed motions to

18  change custody and/or visitation. The past incidents are "evidence bearing on whether there is a

19  real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*[59] (1983).

20  150.   The plaintiff requests immediate injunctive relief for the allegations against Hon. Lauren

21  C. Bowers and Rebecca Nelson in their official capacities. He seeks to have them both removed

22  from his case under Title II of the ADA and under the Rehabilitation Act pursuant the decision in

23  *Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009).

24  151.   Pursuant 42 U.S.C. § 1983, the plaintiff's injury will be redressed by a favorable decision

25  granting him injunctive relief that precludes Rebecca Nelson from conducting or influencing any

26  further interviews or proceedings, and precludes Judge Bowers from adjudicating any further

27

28  [58] 260 F.3d 1124.
    [59] 461 U.S. at 102, 103 S.Ct. 1660. (internal quotation marks omitted).

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    proceedings, involving the family law case.

2    152.   The plaintiff is not required to prove intentional discrimination to prove a violation of

3    ADA Title II in order to obtain injunctive relief. *Crowder v. Kitigawa, Chairman Hawaiian Bd.*

4    *of Control[60]* (9th Cir. 1996).

5        • **Prospective Injunctive Relief**

6    153.   In the alternative, the plaintiff seeks prospective injunctive relief that would effectively

7    remedy the potential for further, repeated harm by an order for the Superior Court of El Dorado

8    County to transfer the venue to Placer County, where the mother resides. The plaintiff alleges the

9    mother has benefitted from the actions of the Defendants and thus has refused to stipulate to

10   move the case despite the fact that it's close to her home, the child support case has already been

11   removed to Placer County where she receives Cash Aid, and neither party resides in El Dorado

12   County.

13   154.   The plaintiff seeks to have both CCRC reports prepared by Rebecca Nelson eliminated

14   from the file, to have a permanent injunction preventing any use or reference to these reports, and

15   to have a notation placed on the file enjoining all parties to refrain from disseminating,

16   duplicating, or invoking these reports in any manner.

17       • **Compensatory Relief – Title II of the ADA**

18   155.   The U.S. Supreme Court's holding in *Garrett v. Trustees of the University of Alabama*[61]

19   that private civil actions for compensatory and punitive damages are unconstitutional logically

20   extends to Title II as well, except when the public entity subject to suit receives federal funds.

21   The U.S. Supreme Court identified "four statutes prohibiting recipients of federal financial

22   assistance from discriminating based on certain protected grounds" that Congress has enacted

23   pursuant to the Spending Clause, which are Title VII, Title IX, the Rehabilitation Act, and the

24   ACA" and concluded that "legislation enacted pursuant to the spending power is much in the

25   nature of a contract: in return for federal funds, the [recipients] agree to comply with federally

26

27

---

[60] 81 F.3d 1480.

28   [61] 531 U.S. 356 (2001).

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    imposed conditions." *Cummings v. Premier Rehab Keller, P.L.L.C*[62]. (2022).

2    The Superior Court of California, County of El Dorado receives federal grants. As such, it is

3    subject to compensatory damages. Plaintiff alleges the expense to him in terms of debt to his

4    family for attorney fees, legal costs, transportation, and miscellaneous expenses relating to pre-

5    trial, trial, and post-trial litigation exceeds $40,000. Plaintiff cites the $40,000 estimate for

6    practicality.

7    Compensatory damages are presumptively available to Plaintiff for the Superior Court's

8    alleged multiple and repeated violations of his federally protected rights. Pursuant *Franklin v.*

9    *Gwinnett* [63](1992) upheld in *Barnes v. Gorman*[64] (2002). The presumption is based on the

10   doctrine that "the right to recover the damages from the party who violated the statute" is

11   essential "to make good the wrong done."[65]. The general rule is that 'absent clear direction to the

12   contrary by Congress, the federal courts have the power to award any appropriate relief in a

13   cognizable cause of action brought pursuant to a federal statute.'" *Franklin*[66](1992).

14   [135 Cong. Rec. S10742, S10760 (Sept. 7, 1989)]. In the House Report, Congress

15   indicated a concern over what remedies would be available to make Title II effective in

16   combatting discrimination. See H.R.Rep No. 101-485(II) & (III) reprinted in 1990 U.S.C.C.A.N.

17   303,322,381,445,475. The Report notes: "As with section 504, there is also a private right of

18   action [under Title II] for persons with disabilities, which includes the full panoply of remedies."

19   *Ferguson v. City of Pheonix*[67] (9th Cir. 1998).

20   ADA § 107(a), 42 U.S.C. § 12117(a) (1994) states: (a) Powers, remedies and procedures:

21   The powers, remedies, and procedures set forth in sections 705, 706, 707, 709, and 710 of the

22   Civil Rights Act of 1964 (42 U.S.C. §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9) shall

23   be the powers, remedies, and procedures this title provides to the Commission, to the Attorney

24   General, or to any person alleging discrimination on the basis of disability in violation of any

25

---

26   [62] 142 S. Ct. 1562, 212 L. Ed. 2d 552 at 1569-70.
     [63] 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208.

27   [64] 536 U.S. 181.
     [65] *Id.* at 61; 503 U.S. at 66, 112 S.Ct. 1028.

28   [66] *Id* at 61; 503 U.S. at 70-71, 112 S.Ct. 1028.
     [67] 157 F.3d 668.

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1    provision of this Act…"

2    156.    Plaintiff alleges that Rebecca Nelson is not immune to damages for her personal actions

3    against him and that her actions affecting the plaintiff were committed with conscious disregard

4    for his federally protected rights under color of state law.  Rebecca Nelson therefore runs afoul of

5    the superior authority of the U.S. Constitution.  "[She is] in that case stripped of [her] official or

6    representative character and [is] subject in [her] person to the consequences of [her] individual

7    conduct."  (*Ex Parte Young*[68] (1908).

8    157.    Plaintiff alleges that Rebecca Nelson's role in the Court arguably makes the Court itself

9    liable for treble damages for violating Cal. Civil Code § 54(c).  The plaintiff states for the record

10   that he is not requesting treble damages as a punitive award nor to set an example of the Court

11   and thus treble damages should not be barred.  The plaintiff makes this request because it would

12   alleviate the burden of the untallied cost to him and will allow him to obtain representation for the

13   future litigation that arises from the violations outlined herein.

14   158.    The Court staff acted with deliberate indifference to the plaintiff's federally protected

15   rights when he filed formal complaints with the administration about Rebecca Nelson's unlawful

16   actions toward him on October 6, 2022 and February 16, 2024, prior to the child's interview.

17   159.    Judge Bowers acted with conscious disregard to his federally protected rights during the

18   trial when she failed to consider his individualized needs and when he filed a motion for

19   reconsideration which was heard on August 24, 2023 whereby he alleged judicial bias and

20   violations of the ADA.  Judge Bowers' response was that the Court "hadn't considered his

21   disabilities" when rendering her decision at trial, which conflicts with the Court's stated findings

22   that the mother is able to research the schools.

23        Judge Bowers acted with conscious disregard to his federally protected rights in a prior

24   hearing when she disfranchised the plaintiff from financial remedies stating he should continue to

25   seek resources from the Department of Rehabilitation and other services that "do not involve the

26   minor" despite his joint equal responsibility for the care of the child and the mother's advanced

27

28   [68] 209 U.S. 123, 159-60.

1    education, and her established ability, opportunity, earning capacity, and cohabiting partner.

2         Judge Bowers repeatedly shut down the plaintiff's efforts to bring his case before the

3    Court by ignoring his individualized needs in the hearings, by ignoring objective facts, by

4    rendering decisions in favor of the mother that were unsupported by the record, and by denying to

5    hear his motions after the Court ordered the parents meet and confer.

6    160.    The plaintiff alleges that Judge Bowers intended to intimidate him to provoke a chilling

7    effect on his complaints when she stated that the Court "can make a determination of long-term

8    adverse effects *if it considers his disabilities.*" The plaintiff alleges this is a veiled threat that

9    coexists with Judge Bowers threat to find him a vexatious litigant so he cannot pursue any

10   procedural remedies for violations of his rights.

11   161.    A favorable decision for compensatory damages would relieve the plaintiff of the

12   financial burden he encumbered when he was forced to go to trial without accommodations to

13   protect his liberty interest in equally participating in the upbringing of his child.  The trial resulted

14   from the damaging CCRC report issued by Rebecca Nelson.  The plaintiff alleges that the

15   outcome was unfavorable due to barriers to communication and judicial bias.

16   162.    Plaintiff will likely have another trial if he can successfully raise the appeal and the case is

17   reversed and remanded.  A favorable decision will allow him to retain the attorney.

18        • **Eleventh Amendment Immunity Abrogated by Title II ADA**

19   163.    Congress has validly abrogated states' Eleventh Amendment immunity from suit under

20   Title II of the ADA based on denial of access to the courts.  In any action against a State for a

21   violation of the requirements of this Act, remedies (including remedies both at law and in equity)

22   are available for such a violation to the same extent as such remedies are available for such a

23   violation in an action against any public or private entity other than a State.

24   164.    The state is not entitled to sovereign immunity under Eleventh Amendment, because

25   Congress validly abrogated right to immunity from suit for claims under 42 USCS § 12202, part

26   of Title II of Americans with Disabilities Act of 1990 (ADA), 42 USCS §§ 12131–12165, and the

27   state waived immunity for claims under § 504 of Rehabilitation Act of 1973, 29 USCS § 794

28

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

1   when it accepted federal funds. *Miranda B. v. Kitzhaber*[69] (2003).

2   165.    Title II of Americans with Disabilities Act of 1990, 42 USCS §§ 12131 et seq., as it

3   applies to class of cases implicating fundamental right of access to courts, constitutes valid

4   exercise of Congress's authority under U.S. Const. amend. XIV, § 5, to enforce guarantees of

5   Fourteenth Amendment, and thus express abrogation of state sovereign immunity is

6   constitutional. *Tennessee v. Lane*[70] (2004). There is a well-established due process principle that

7   "within the limits of practicability, a State must afford to all individuals a meaningful opportunity

8   to be heard." *Tennessee v. Lane* (citing *Boddie v. Connecticut*[71](1971).

9   **Prayer for Relief**

10         WHEREFORE, Plaintiff prays that this Court:

11              (a) Enter judgment against the defendants;

12              (b) Enter a declaratory judgment declaring the acts of the defendants to be a

13   violation of Plaintiff's civil rights pursuant Title II of the Americans with Disabilities Act

14   of 1990; The Rehabilitation Act of 1973; and California Civil Code §§51(f), 54(c) and

15   54.1(d)l

16              (c) Issue a declaratory judgment declaring that the actions of defendants toward

17   Plaintiff are unconstitutional;

18              (d) Issue a temporary restraining order, and a preliminary and permanent

19   injunction enjoining Defendants Rebecca Nelson and Judge Bowers to be removed from

20   his family law case, to refrain from taking such actions toward the plaintiff in the future,

21   and to refrain from retaliating against the plaintiff in any way;

22              (e) Issue a permanent order to remove Rebecca Nelson's CCRC reports from the

23   file and to strike all references to her reports from the record and enjoin all parties to

24   refrain from any duplication and dissemination of the reports, and enjoin future

25   counselors, whether court-appointed or independent, to disregard the reports in their

26

27   _____
     [69] 328 F.3d 1181 (9th Cir. 2003).
     [70] 541 U.S. 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820, U.S. LEXIS 3386 (2004).
28   [71] 401 U.S. 371.

1  entirety to safeguard the plaintiff from their discriminatory effect;

2      (f) Award Plaintiff compensatory damages in the amount of $40,000 for legal costs

3  and fees for pre-trial motions, trial prep, three-day trial, and post-trial motions and

4  renewed motion to change the schedule, and retain jurisdiction over any future expenses

5  the plaintiff incurs as a result of discriminatory actions of Rebecca Nelson and Judge

6  Bowers;

7      (g) Award Plaintiff compensatory damages in the amount he should have received

8  in Cash Aid for a household of two people since the date of filing his motion for Cal. Fam.

9  Code § 3086 relief;

10      (h) Award Plaintiff costs, interest and reasonable attorneys' fees for this action

11  pursuant to 42 U.S.C. §1988, and other relevant statutes, if applicable;

12      (i) Order such other and further relief as the Court deems just and proper under the

13  circumstances.

14  **Demand for Jury Trial.**

15  Plaintiff hereby demands a jury trial.

16  Dated March 31, 2024                    Respectfully submitted,

17

18

19

20                    **Justin G. Reedy, Plaintiff, In Pro Per**

21

22

23

24

25

26

27

28

COMPLAINT FOR CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1983 AND ADA

# EXHIBIT A

1   Justin G. Reedy
    7295 Amherst Street
2   Sacramento, CA 95822
    916.428.1510
3

4   JUSTIN G. REEDY, IN PRO PER

5

6

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF EL DORADO

10  JUSTIN G. REEDY,                    No.  PFL-20180289
11              Petitioner,             MEMORANDUM OF POINTS AND
                                        AUTHORITIES
12      vs.
                                        Hearing Date: Feb. 29, 2024
13  KAYLA A. MCKINNEY,                  Dept. 5
14              Respondent.             **Honorable Judge Bowers**

15       The parties have one daughter.  DOB 6/19/2018.  They had a three-day trial that ended 5/31/23.

16  Petitioner filed a motion for reconsideration that was heard on 8/24/23.  At issue was school choice,

17  custody, visitation, and the child's nickname.

18                  I.   **Factual and Procedural Background**

19       The court ordered that parties meet and confer and discuss school choice with our coparenting

20  counselor, Carol Greenfield, prior to Respondent exercising a tiebreaker.  Respondent sought the 4-3-

21  3-4 schedule.  It was granted.  She selected a school based on that schedule.

22                  II.  **Law and Argument**

23       Ms. Nelson personally marginalized me as a parent because of my disabilities.  She thanked

24  me for providing the questionnaire and said, "if *you* even wrote it," and then questioned me on the

25  content. I had my Responsive Declaration, but she wouldn't review anything that wasn't in the file.

26  She now states that she referred to my "attachment of conversations on TalkingParents" and "asked if

27  I wrote them."  She falsely states that my mother, Debra Reedy, told her that "she wrote the texts in

28  Talking Parents to ensure everything was covered for court purposes."  This is a lie.

**Cal. Rules of Court, Rule 5.210 (d)(2)(C)(i)** states, in relevant part, that "Each court-appointed mediator must "use *reasonable efforts*" to "*reduce acrimony* by *helping the parties improve their communication skills*." Ms. Nelson violated this statute when she attacked my mother for assisting me and lied about what she said in the interview. She is attempting to deny my right to ADA accommodations in violation of state and federal laws and public policy.

Ms. Nelson brought up issues that were not before the court. I got stressed, and my mother patted me on the shoulder. Ms. Nelson stated, *"He's doing fine."* She *didn't ask* how I was doing.

She informed me she made an appointment with Respondent to bring our daughter for an interview. The emphasis on my reply should be read that *I* wanted to bring her. My immediate concern was that Respondent would influence our five-year-old's statements prior to the interview since she is the one seeking a change in the schedule and the interview was scheduled on her parenting time.

Before our daughter's interview, my family and I went to the court and sat downstairs. A sheriff's deputy asked if we had an appointment. It was close to 4 pm. I didn't know if it was canceled. He spoke with Ms. Nelson. When she opened the door, she asked, "What are *YOU* doing here" in a nasty tone, glaring at me. I told her I wanted it on record that I object to the interview. I then said that the American Academy of Pediatrics reports that a child this young should have a support person in the room, and I asked if my stepfather could go in with her. Ms. Nelson would not allow it. She stated that "she worked for CPS for thirty years" and knows how to do an interview.

Ms. Nelson's behavior toward me violates **Title II of the ADA** which prohibits discrimination against qualified individuals with disabilities in all programs involving state and local governments. The administration approved my mother as an appropriate ADA support person. Ms. Nelson made false statements to bolster her recommendation to preclude my mother from future interviews. She violated **Cal. Rules of Court, Rule 5.210 (d)(1)(A)** which requires that "Mediators are impartial, competent, and uphold the standards of practice contained in this rule of court."

Ms. Nelson reports that "it's *curious* that I wanted to spend ten minutes with my daughter before the interview" (page 7, lines 15-16), suggesting that I have some nefarious motive. However, I have expressed serious concerns about questioning a five-year-old and am concerned that our child

wouldn't have the ability to stop the interview on her own or express her feelings or concerns about being involved. Ms. Nelson testified that interviews are traumatic. **Cal. Rules of Court, Rule 5.210 (h)(5)** states that Ms. Nelson was required to consider the health, safety, welfare, and best interest of the child *in all phases of the process,* and she violated this statute by choosing to interview a five-year-old child on the issue of a *change in the schedule.* **Cal. Rules of Court, Rule 5.210(d)(2)** states that "Each court-connected mediator must: maintain an overriding concern to integrate the child's best interest within the *family context.* She violated this statute by *denying* our daughter a few minutes to visit with me so that I could offer parental support.

Ms. Nelson is NOT an expert in child development. She has no idea what affect her actions have had on the child. She now wants to have minor's counsel continue to involve her in the proceedings, and I believe this is to ensure that the child's statements could be manipulated and offered as evidence because she won't be old enough to testify. Five-year-olds are not reliable witnesses. This would accomplish Ms. Nelson's stated goal of not repeating her mistake regarding hearsay that caused her last report to be all but thrown out.

This court ruled out minor's counsel at the 1/26/23 hearing stating "neither parent could afford it." Ms. Nelson has put pressure on the court to burden the taxpayers with an appointed attorney. The child having an appointed attorney when I can't afford one violates my due process rights and places an undue burden on me. In addition, Ms. Nelson hasn't established the criteria for appointment of counsel under **Cal. Rules of Court, Rule 5.240.** The child is not experiencing stress that can be alleviated by her own counsel; Counsel representing the child would not be likely to provide the court with relevant information not otherwise readily available or likely to be presented; The court has already determined that both parents are capable of providing a stable, safe, and secure environment; There are no allegations of child abuse before the court.

**Cal. Rules of Court, Rule 5.210(d)(2)(C)(i)** states, in relevant part, that court-connected mediators must "focus on the child's needs and *areas of stability* and *identify the family's strengths.*" Ms. Nelson made no effort to identify the family's strengths or areas of stability. She lied about statements she claims my mother made to support her own allegations that my mother is acting as a parent to our child. She failed to affirm that my mother's help improves communication and

reduces acrimony, and she failed to recognize that I have a right to my mother's help with legal document preparation and accommodations pursuant the ADA and other state and federal protections. She repeatedly attacked my family which is my support network. She made recommendations that are disruptive to the child, including returning the child to a 2-3-2 schedule that neither parent requested and that she, as an expert in parenting plans, supported changing to Respondent's requested 4-3-3-4 at trial in May 2023. She also testified as an expert witness on parenting plans that the child should attend a school in one parent's neighborhood if the drive was 30 minutes, but now she's contradicted that parenting plan and is recommending the child remain in her current school ignoring the 50-minute drive and the potential for her to be involved in a life-threatening car crash as her hours on the road commuting increase. The only support Ms. Nelson has for her recommendations are derived from a 30-minute interview with a five-year-old.

Pursuant to **Cal. Rules of Court, Rule 5.210 (d)(2)(a),** "Each court-connected mediator must: Maintain and overriding concern to integrate the child's best interest within the family context." Ms. Nelson states that Aliyah said, "Mother's attention at home is on the baby, and she gets *ignored*. But when *Gigi* (maternal grandmother) visits, she gives me *all her attention*." Ms. Nelson states our daughter told her that "On weekends she can have fun because she *gets to see Gigi*, go camping, and do fun things with mother." (CCRC report page 4, lines 16-19). Our daughter is quoted as telling Ms. Nelson that she will *spend more time with Gigi on the weekends*, and yet, there is no concern that Gigi is already taking care of her after school when Respondent and her boyfriend are at work.

Maternal grandmother has a prior criminal record for allowing children to have sex when she was working at the Juvenile Hall as a counselor. There was sufficient evidence to bring charges regarding allegations that she orally copulated a teenaged boy in the Juvenile Hall. This should be concerning to Ms. Nelson because maternal grandmother is spending a lot of her time babysitting. She is also funding Respondent's litigation. She is promoting further conflict instead of a "reset."

The Placerville Mt. Democrat reported on the Juvenile Hall Sex Scandal at least 5 times. The criminal case had to be moved to Placer County. Judge Haas is reported to have instructed maternal grandmother to get help and not to work around young people. I seriously question whether Ms. Nelson was affiliated with maternal grandmother through her work at CPS.

My mother has no such criminal history involving contributing to the delinquency of minors, and her involvement in this case is the direct result of continuous litigation instigated by Respondent and funded by maternal grandmother.   There is no evidence that she is parenting our child on my parenting time, but this is a convenient argument due to my disabilities.   The only support Ms. Nelson provided is her own false statements and confirmation bias.

Pursuant to **Cal. Rules of Court, Rule 5.210 (d)(2)(a),** "Each court-connected mediator must: Maintain and overriding concern to integrate the child's best interest *within the family context.*" Ms. Nelson did not consider Aliyah's best interest when she failed to review the documents in the file prior to the last mediation where Ady Langer recommended no changes to custody and that the parents need to seek a midway school between their homes and that the child be enrolled in play therapy.  She failed to review the court file to find that Respondent removed the child unilaterally from play therapy against my will and that this issue is currently before the court for contempt.  There is a standing order for play therapy to continue, but this issue is not properly before the court.

Ms. Nelson took it upon herself to make a recommendation for the child to attend therapy without any explanation based on a 30-minute interview with a five-year-old.  Our daughter was evaluated by a Psy.D. who determined that she has no mental health concerns, and neither parent has raised any concerns about her mental health.

The scope of the CCRC was to determine whether to change the schedule.  The recommendations seek to escalate the litigation and the involvement of more professionals to convolute the issues.  Ms. Nelson's licensure under the California Board of Behavioral Sciences extended from 2013 to 2014. The BBS reports (Exh. A) show that she didn't advance beyond Associate Clinical Social Worker.  Therefore, she has not become proficient in professional practice nor is she bound by professional ethics for clinical social workers under Bus. & Prof. Code § 4996 et. seq. There is no oversight for Ms. Nelson's professional performance other than this court.

**Cal. Rules of Court, Rule 5.210(d)(2)(C)(iii)** states, in relevant part, that court-appointed mediators must "Control for *power imbalances* between the parties during mediation."

Ms. Nelson promoted a power imbalance by scheduling our daughter's interview with our child's mother and informing me afterward.  She was nasty and condescending to me, making it clear

that my presence wasn't welcome at the child's interview, but she smiled at Respondent and greeted her when she arrived with our daughter. Her report also treats the maternal and paternal grandmothers' roles unequally, endorsing our child's opportunity to spend more time with *Gigi* while criticizing my mother for acting as a parent. To that end, the 2/13/24 report resurrects unfounded allegations made by Ms. Day of Brookfield Preschool that were included in Ms. Nelson's first report of 9/27/22. Ms. Day wasn't called to testify at the trial, her statements are hearsay, and relying on them after all this time when our child has been attending kindergarten since August 10, 2023 demonstrates Ms. Nelson's seeks confirmation bias because she has a personal agenda.

Ms. Nelson is not impartial or competently carrying out her duties in violation of **Cal. Rules of Court, Rule 5.210 (d)(1)(A).** She made no effort to contact Blue Oaks Elementary, where our daughter is attending presently, to ask about my volunteering, participation in afterschool activities, participation in homework and the parent-teacher conference, and that I get her to school on time.

In addition, Ms. Nelson purposely avoided making any recommendations addressing Respondent's boyfriend. She notes that he should not be participating at our daughter's school events, but she makes no discussion of the impact on a child an unrelated male in the home has. Instead, she focused on Craig, whom she concludes Aliyah doesn't like. This is a person who has very little involvement in her life and actually lives in my mother's home, not mine. There is a *conspicuous absence* of any statements made in her interview with our daughter regarding Austin Chavez, with whom Aliyah lives on her mother's parenting time.

All of these behaviors violate **Cal. Rules of Court, Rule 5.210 (h)(9),** which states, "Mediation must be conducted in an atmosphere that encourages trust in the process and perception of fairness. To that end, mediators must maintain objectivity, provide and gather balanced information for both parties, and control for bias.

Ms. Nelson falsely states that when asked if I had looked into midway schools, I said I hadn't (page 2, lines 17-18). **Cal. Rules of Court, Rule 5.210 (e)** states, in part, "All court-connected mediation processes must be conducted in accordance with state law and include:

(1) Review of the intake form and court file, if available, before the start of mediation."

Ms. Nelson failed to review the file since the last trial date of May 31, 2023. If she had, she

would have known I updated the court on our daughter's successful enrollment in Cameron Ranch Elementary School and Bridges Afterschool Program and asked for reconsideration. I specifically brought up the fact it was 37 minutes to Cameron Ranch and about 50 minutes to Blue Oaks and had that information at the top of my outline.

Above all, Ms. Nelson is dishonest, and therefore, nothing in her report can be relied upon.

### III. Requested Relief

For all of the above stated reasons, I, the Petitioner in this case, request that the Court reject all of the recommendations of CCRC, Rebecca Nelson, as stated in the report dated 2/13/2024.

I also request that the court immediately terminate Ms. Nelson's appointment to our case and, if necessary, appoint another mediator in the future.

Lastly, I respectfully request that the court limit Respondent's motions for mediation since the paramount interest of the courts is in furthering the child's need for stability and continuity in custody arrangements unless some significant change in circumstances indicates a different arrangement would be in her best interest. (*Montenegro v. Diaz, supra.* 26 C4th at 256, 109 CR2d at 580(2001); *Burchard v. Garay* 42 C3d 531, 535, 299 CR 800, 802 (1986).

Dated: 2/22/24

Justin G. Reedy,

In pro per

---

**7**

PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES

# EXHIBIT A

# CALIFORNIA BOARD OF BEHAVIORAL SCIENCES

## LICENSING DETAILS FOR: 60337

**NAME:** NELSON, REBECCA ANN

**LICENSE TYPE:** ASSOCIATE CLINICAL SOCIAL WORKER

**PRIMARY STATUS:** CANCELLED

LICENSE HAS BEEN EXPIRED FOR AT LEAST THREE YEARS AND IS NOT RENEWABLE; THE REGISTRATION HAS BEEN AUTOMATICALLY CANCELLED UPON ISSUANCE OF A LICENSE; OR HAS REACHED ITS 6 YEAR LIMIT. PURSUANT TO AB 1677, CH. 657, STATS. 1999, THE BOARD NO LONGER REGISTERS PROFESSIONAL CORPORATIONS, THEREFORE ALL PROFESSIONAL CORPORATIONS ON THIS WEBSITE REFLECT A "CANCELLED" STATUS.

**PREVIOUS NAMES:** KRAL, REBECCA A

**ADDRESS OF RECORD**

1750 PRAIRIE CITY RD
SUITE 130-192
FOLSOM CA 95630-9595
SACRAMENTO COUNTY

**ISSUANCE DATE**

DECEMBER 13, 2013

**EXPIRATION DATE**

DECEMBER 31, 2014

**CURRENT DATE / TIME**

FEBRUARY 22, 2024
4:50:1 PM

# CALIFORNIA BOARD OF BEHAVIORAL SCIENCES

## LICENSING DETAILS FOR: 60337

**NAME:** NELSON, REBECCA ANN

**LICENSE TYPE:** ASSOCIATE CLINICAL SOCIAL WORKER

**PRIMARY STATUS:** CANCELLED

**PREVIOUS NAMES:** KRAL, REBECCA A

**ADDRESS OF RECORD**

1750 PRAIRIE CITY RD
SUITE 130-192
FOLSOM CA 95630-9595
SACRAMENTO COUNTY

**ISSUANCE DATE**

DECEMBER 13, 2013

**EXPIRATION DATE**

DECEMBER 31, 2014

**CURRENT DATE / TIME**

FEBRUARY 22, 2024
4:51:12 PM

1  Justin G. Reedy
   7295 Amherst Street
2  Sacramento, CA 95822
   916.428.1510
3

4  JUSTIN G. REEDY, IN PRO PER

5

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                          FOR THE COUNTY OF EL DORADO

10 JUSTIN G. REEDY,                          No. PFL-20180289
11              Petitioner,                   PETITIONER'S REPLY DECLARATION TO
                                              CCRC REPORT DATED 2/13/2024
12     vs.
                                              Hearing Date: Feb. 29, 2024
13 KAYLA A. MCKINNEY,                         Dept. 5
                Respondent.                   **Honorable Judge Bowers**
14

15      Ms. Nelson testified at trial on 5/23/23 that "every time a child is taken to a doctor or

16 interviewed by a social worker or anyone else, it's traumatizing to the child when there's been no

17 evidence of abuse." (Exh. A pg 149). I request the court take judicial notice of Ms. Nelson's

18 testimony regarding this matter.

19      Ms. Nelson decided to interview a five-year-old at the courthouse in private without an adult

20 with whom she's acquainted to determine whether a change in a parenting was advisable. I allege

21 that this was never her reason. Based on peer-reviewed articles and guidelines for custody

22 evaluations and her own testimony, Rebecca Nelson exposed our daughter to traumatizing harm to

23 obtain "evidence" to support her own biased agenda against me. Respondent was complicit. The

24 testimony of our daughter is of highly questionable probative value, as it is widely recognized that

25 children of this age provide erroneous testimony due to limitations in their memory, communication

26 skills, and suggestibility.

27      I filed a complaint and notified the administration that I opposed the interview. Respondent

28 falsely stated on Talking Parents that the appointment would be canceled if I didn't agree. (Exh. B).

                                              1
                    PETITIONER'S REPLY DECLARATION TO CCRC REPORT DATED 2/13/2024

1   Rebecca Nelson asserted that she worked for CPS for thirty years and knows how to do an

2   interview. Her job as CCRC is not to be a CPS interrogator. She is supposed to be identifying the

3   issues we can agree to and helping us find a resolution or make recommendations where necessary.

4   Instead, her behavior seeks to relitigate issues that have already been resolved by this court.

5   For instance, Ms. Nelson lied in her report stating that my mother told her in the interview that she

6   writes the Talking Parents messages. There are companies that help high conflict parents with live

7   monitoring of communications for the purpose of reducing acrimony (Exh. C), demonstrating that my

8   mother's help is in good faith and beneficial. (Exh. D pg 49). However, Rebecca Nelson doesn't

9   seem to be aware of these benefits and doesn't focus on anything positive about my family's

10   involvement, and this is in harmony with Respondent's attempts to alienate my mother. Respondent

11   made this same allegation and *sought an order from the court* during the trial. (Exh. D pgs. 50-51).

12   My mother *testified that she doesn't write my messages*. (Exh. D pgs. 160-163). Yet, *this is one of*

13   *the recommendations* in Ms. Nelson's report. Disability and high stress are reasons I need help with

14   communications and that help includes having my mother monitor the way I respond.

15   Ms. Nelson focused pages of her report on continuing to attack my mother, which she also did

16   in her report of 9/27/23. She included statements from her last report in this current one despite the

17   fact that new information is available from Blue Oaks Elementary that clearly shows that my mother

18   is not involved in our daughter's education. In fact, I went to the afterschool program and was told

19   that maternal grandmother picks up our daughter on a regular basis, usually within 15 minutes of our

20   daughter arriving in the program.

21   Ms. Nelson's stated intent from the first interview was to "choose one parent" and she

22   continues to pursue that end. Her last CCRC report wasted court resources, disrupted the schedules

23   of several professionals who had to appear on my behalf as expert witnesses, and was enormously

24   expensive. Her incompetence is harmful to our child. I have had to borrow tens of thousands of

25   dollars to litigate matters that were exacerbated by her personal biases and unethical behavior.

26   Ms. Nelson's interview and report focus on all kinds of issues that are unrelated to the RFO

27   before the court. I filed two declarations, one on 1/11/24 and one on 1/12/24 to address new issues

28   raised in the interview that were not in Respondent's motion, including the court's adoption of the

prior CCRC's recommendation for us to keep extracurricular activities separate. Here again, Ms. Nelson is biased. The court order (See MC-030 filed 1/12/24) shows that we can schedule activities on each other's parenting time *if we get consent ahead of time*. Ms. Nelson's report attacks me for asking Respondent to bring our daughter to the ballet performance (page 8, lines 10-11) but ignores that I did so *months in advance* in compliance with the order. (Exh. E).

Clearly, the issues Ms. Nelson raises in her report have already been before the court and do not need to be relitigated, but ***both Ms. Nelson and Respondent want another bite at the apple***.

My mother was present to support me based on my "individualized needs" which included emotional support, which is what she provided. She sat quietly most of the time other than to reach out and try to keep me calm and focused. She provided no information. Yet, Ms. Nelson's report states that that "[my mother] said she made the chart for [me]." This is another outright lie. I made the chart myself. I used a similar chart on my first CCRC interview, and it helped, so I did it again.

Nickname

Judge Bowers found at trial that our daughter can be called Lilly in my home and that if she chooses, she can use a nickname. She self-identifies as Lilly to her friends but knows her mother doesn't allow her to be called Lilly and that is why she is called by her formal name at school. I ask the court to take judicial notice of its own findings that ***Ms. Nelson is not an expert in Child Development***. I therefore contest any conclusions she has drawn about the use of a nickname, and I ask the court to note that this issue is not properly before the court and that Ms. Nelson has taken it upon herself to complicate an RFO seeking to change the schedule on the basis of one 30-minute interview with a five-year-old child. These matters were resolved in an unnecessary three-day trial due to her last biased and unfounded report, and there was further hearing on reconsideration on 8/24/23 which Ms. Nelson would know if she had reviewed the file. There has been ***no report of abuse or neglect*** and ***no report of confusion at the school*** relating to our child not knowing her name or identity. In fact, Ms. Nelson once again did not due her due diligence in contacting any collateral contacts at Blue Oaks Elementary because to do so would undermine confirmation bias.

Who is parenting the child?

I requested orders to allow me to take our daughter camping on summer vacation. Despite my

1   back disabilities, I'm portrayed as someone who lays around in bed playing video games. This shows

2   a complete disregard for me as a disabled parent. Recently, my back was out, and I had to stay in bed

3   recovering after a medical visit. Being a recent event, it influenced what our child said. She probably

4   told her mother who told her to say this at the interview. If our daughter was interviewed after a trip

5   to Legoland (Exh. F), she would have said something completely different. I have always been an

6   involved parent (Exh. G), and the court should put an end to the taxpayer's burden of paying for

7   CCRC interviews that are weaponized for the exclusive purpose of finding me unfit.

8        Ms. Nelson's report is full of lies, so it's anybody's guess what the child actually said and

9   what questions she was asked. Ms. Nelson doesn't want any oversight and that is why she is seeking

10  minor's counsel so that there will be someone to help her corroborate statements from a suggestible

11  child who can't testify in court because she is too young and whose testimony is totally unreliable.

12  These are legal tactics intended to complicate a high-conflict case where custody has been resolved

13  twice at trial. It's also ludicrous that Respondent didn't know she wasn't getting weekends. This is a

14  bait and switch to get her choice for school and now to force me and our daughter to drive

15  excessively so she can have weekends without any responsibility for school transport. (See

16  Responsive Declaration addressing this issue at length).

17       The report is a waste of court resources to challenge my custody again without any

18  justification. Ms. Nelson appears to be colluding with Respondent and her family because she is

19  doing their bidding instead of conducting unbiased interviews focused on reducing conflict and

20  improving communication and coparenting. She has made inconsistent recommendations about the

21  school choice, changing her mind from her initial testimony where she stated that "the child should

22  remain in the community of one parent *if the drive to school was 30 minutes*" (Exh.H) to now stating

23  in this report that it's "not in Aliyah's best interest to attend a school outside Mother's or Father's

24  community as previously stated." (page 7, lines 23-25). That's not what she stated.

25       She changed her mind about issues to which she has *testified under oath* which doesn't

26  promote confidence. If Judge Bowers can change her mind after a three-day trial with no new

27  evidence or law, and Ms. Nelson can change her mind because she has the authority to manufacture a

28  child's testimony, and Respondent can claim she didn't know she wasn't getting weekends and needs

a new mediation report to challenge my custody, then there is no confidence in this court because there is no consistency, no integrity, no oversight, and no accountability other than through an appeal.

Our daughter shouldn't be subjected to any of this. I have provided the only stability and am being forced into litigation that is destabilizing for our family. Moreover, Rebecca Nelson has made no effort to evaluate the risks to the child of being involved in a traffic accident, an injury traffic accident, or a fatal traffic accident, ignoring that road traffic accidents are a leading cause of child deaths in the U.S., accounting for one in five childhood fatalities according to the Institute for Health Metrics and Evaluation. Our daughter is too young to understand the logistical changes or to consider the extra hours on the road, and that is why it's the responsibility of parents to decide.

Ms. Nelson is using statements made by a five-year-old child to support her recommendations stating that "Aliyah is requesting to have weekends with her mother" when our daughter didn't even know what the weekend was until her mother's birthday on January 21st. She also reported our daughter stating, "she wanted *everything to stay the same* but she wants to have weekends with her mom," which is an oxymoron. There is a new dynamic. She's no longer an only child in their home. The baby comes first and has a father who is his natural father living in the home, and regardless of how much time he spends with our child, he's not her father. Disrupting her routines won't make it better. It's best for our daughter that the court continue the current arrangement.

It appears that Ms. Nelson wants to relitigate her past report as much as Respondent wants to relitigate the schedule. I requested a new trial, and that request was denied.

I am now asking the court to limit litigation to the issue properly before the court in Respondent's motion and to disregard all recommendations on the basis of bias and violations of state and federal law. The recommendations do not serve the primary interest of maintaining stability and continuity for the child. [See Addendum for Declaration of Debra Reedy.]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Justin G. Reedy,
Petitioner, In Pro Per